KOESTER v NOVI

Docket No. 161135. Submitted April 5, 1995, at Lansing. Decided
September 29, 1995, at 9:20 A.M. Leave to appeal sought.

Karen L. Koester brought an action in the Oakland Circuit Court
against the City of Novi and its chief of police, alleging employ-
ment-related violations of the Michigan Handicappers' Civil
Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*, for
discrimination based on pregnancy and of the Civil Rights Act,
MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, for sex discrimina-
tion and sexual harassment. The court, Gene Schnelz, J.,
granted summary disposition for the defendants of the claims
of pregnancy discrimination. The jury rejected the plaintiff's
claim of sex discrimination, but upheld the plaintiff's claim of
sexual harassment. The plaintiff appealed, and the defendants
cross appealed.

The Court of Appeals *held:*

1. The trial court did not err in summarily dismissing the
claims of pregnancy discrimination. Under the Michigan Hand-
icappers' Civil Rights Act, a physical characteristic is a handi-
cap that is subject to the protections of the act if it is unrelated
to the individual's ability to perform the duties of a particular
job or position. In this case, the plaintiff admitted that her
doctor's restrictions rendered her unable to fulfill the job
requirements of a police officer assigned to road patrol. The
defendants' duty under the act to accommodate the plaintiff did
not extend to placing her in another position.

2. The trial court abused its discretion in not allowing the
plaintiff to present evidence that, despite an official policy of no
light duty, male employees were permitted to work in light-
duty positions while disabled. The proffered evidence was rele-
vant to the plaintiff's claim under the Civil Rights Act of sex
discrimination based on disparate treatment.

3. The trial court did not abuse its discretion in rejecting

REFERENCES
Am Jur 2d, Civil Rights § 158, 177; Job Discrimination §§ 202, 450,
962.
See ALR Index under Disabled Persons; Maternity; Sexual Harass-
ment.

supplemental jury instructions proposed by the plaintiff. One instruction would have informed the jury that the city was not legally prohibited from treating pregnant employees more favorably than other employees. However, because the Civil Rights Act does not require preferential treatment of a member of a protected class, the instruction might have confused the jury. The other proposed instruction related to the disparate impact of the loss of employment benefits. This instruction was not supported by the evidence and likely would have misled and confused the jury.

4. The trial court erred in denying the defendants' motions for summary disposition and a directed verdict regarding the claim of sexual harassment under the Civil Rights Act. Comments attributable to the defendants concerning pregnancy, career choice, and child rearing did not constitute sexual harassment under the act because they were not communications of a sexual nature, but merely communications based on gender.

Affirmed in part, reversed in part, and remanded for a new trial regarding sexual discrimination.

1. CIVIL RIGHTS — MICHIGAN HANDICAPPERS' CIVIL RIGHTS ACT — HANDICAPS — PREGNANCY.

Pregnancy is not a handicap that is subject to the protections of the Michigan Handicappers' Civil Rights Act against employment discrimination where it is related to the individual's ability to perform the duties of a particular job or position (MCL 37.1103[b][i]; MSA 3.550[103][b][i], now MCL 37.1103[e][i] [A]; MSA 3.550[103][e][i][A]).

2. CIVIL RIGHTS — MICHIGAN HANDICAPPERS' CIVIL RIGHTS ACT — DUTY OF ACCOMMODATION — NEW JOB PLACEMENT.

An employer's duty under the Michigan Handicappers' Civil Rights Act to accommodate a handicapped employee does not extend to placing the employee in a new job.

3. CIVIL RIGHTS — CIVIL RIGHTS ACT — SEXUAL HARASSMENT — COMMUNICATIONS OF A SEXUAL NATURE.

Comments made by an employer to an employee concerning the employee's pregnancy, career choice, and child rearing are not communications of a sexual nature that create a hostile work environment and do not constitute sexual harassment under the Civil Rights Act (MCL 37.2103[i][iii]; MSA 3.548[103][i][iii]).

*Jamil Akhtar,* for the plaintiff.

*Cummings, McClorey, Davis & Acho, P.C.* (by

*Marcia L. Howe* and *Gail P. Massad*), for the defendants.

Before: CORRIGAN, P.J., `and MARKEY and J. R. ERNST,* JJ.

CORRIGAN, P.J. Plaintiff appeals the trial court's order granting defendants' motion for summary disposition of plaintiff's two claims of pregnancy discrimination under the Michigan Handicappers' Civil Rights Act (HCRA), MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.* She also appeals the jury verdict in favor of defendants on her claim of sex discrimination under the Civil Rights Act (CRA), MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* Defendants cross appeal from the jury verdict for plaintiff on her claim of sexual harassment, also under the CRA. We affirm in part, reverse in part, and remand for a new trial.

I. UNDERLYING FACTS AND PROCEDURAL HISTORY

In 1981, defendant City of Novi employed plaintiff as a police officer assigned to road patrol. In 1984, the city adopted a city-wide no-light-duty policy, which prohibited disabled employees from returning to work until able to perform their regular duties. The no-light-duty policy applied to all city employees. A disabled city employee unable to perform the requirements of the job was permitted to use sick, vacation, and other leave time to remain on the payroll. Once an employee's accumulated leave time was exhausted, the employee would be placed on an unpaid leave of absence. Benefits would be discontinued at this point unless the employee paid for them.

Plaintiff met with Craig Klaver, the assistant

* Circuit judge, sitting on the Court of Appeals by assignment.

city manager in charge of personnel, to discuss pregnancy leave in 1986. Klaver explained to plaintiff that the above policies applied to pregnancy, just like any other condition that rendered an employee unable to perform her job duties. Klaver asked plaintiff, "[H]ow can I give you more for an intentional act than for an officer who is accidentally injured?" Klaver later explained that he meant the no-light-duty policy would certainly apply to someone who made a conscious decision to raise a family, if it applied to someone who was accidentally injured in an accident. He also informed plaintiff that no official maternity leave policy existed. Plaintiff testified that Klaver then said, "You should have thought about having kids before you made your career choice." Klaver, however, denied saying this. Klaver testified that no exceptions were ever made to the no-light-duty policy. He recalled one instance where an officer went to a training program while disabled; however, the officer did so without the city's knowledge and was admonished not to do so again. Another officer, Ron Roy, was permitted to come to work wearing an orthopedic shoe after foot surgery. Roy testified, though, that the shoe did not inhibit his ability to perform his job duties.

Plaintiff became pregnant in early 1988. She was the first pregnant officer in the history of the city. Plaintiff met with defendant Chief Lee Begole to discuss her condition. Plaintiff testified that Begole told her that he believed women should stay at home with their children for two or three years and should not work while pregnant.

In March 1988, after plaintiff experienced some problems early in her pregnancy, plaintiff's doctor restricted her from lifting more than twenty-five pounds and instructed her to avoid trauma to the abdominal area. Plaintiff admitted that these re-

strictions prevented her from fulfilling the physically demanding job requirements of a road patrol officer. Consequently, plaintiff took a leave of absence from work. Plaintiff testified that she was ordered off work by Lieutenant Starnes; Starnes and Deputy Chief Richard Faulkner stated that plaintiff voluntarily left work. Plaintiff's sick, vacation, and personal time was exhausted in July 1988, after which she went on unpaid leave. Her long-term disability payments began in September 1988 and terminated in December 1988.

Shortly after going on leave, plaintiff saw an opening posted for a crime prevention officer, a more sedentary job than that of a road patrol officer. Plaintiff requested the position, but it ultimately went to Officer Robert Gatt. Even Gatt had suggested that plaintiff hold the position during her pregnancy, but the city refused, stating that it would be too costly to train plaintiff for the position, only to have her leave it a few months later.

Plaintiff's due date was late October or early November 1988. In order to be assured of a day shift upon her return to work, plaintiff testified that she put in a bid for the day shift in October 1988 while she was still on leave. At that time, plaintiff had the fifth-highest seniority of all the road patrol officers. Because of her seniority, plaintiff would have been assured her choice of shifts had she been working. Plaintiff stated that the practice when senior officers returned from disability was to bump other officers to give the senior officers their choice of shift. Lieutenant Thomas Hesse, who replaced Starnes, told plaintiff, however, that he would put her on the night shift or any shift where she was needed. Plaintiff ultimately bid for, and received, a day shift spot in April 1989, the next time bids were accepted for shifts.

Upon returning to work in April 1989, plaintiff testified that she was singled out for failing to write enough moving violations, for using the restrooms at the fire station and Twelve Oaks Mall, and for failing to have her badge number on her uniform pants. Plaintiff asserted that she had never been disciplined or reprimanded before she became pregnant. Defendants denied treating plaintiff any differently than the other officers, and pointed out that all the officers were eventually instructed to spend less time socializing at the mall and the fire department, and to place their badge numbers on their uniforms.

Plaintiff was issued a written reprimand for an incident that occurred in July 1990 during the city's "Fifties Festival." Plaintiff testified that, as a senior officer, she was asked to volunteer to work overtime during the festival. Because of her seniority, the collective bargaining agreement permitted plaintiff to decline the extra work. Plaintiff initially agreed to work, but when she could not find a baby-sitter, she called the station and declined the overtime. Defendants' witnesses, however, stated that plaintiff violated a direct order to work the festival. Plaintiff filed a grievance with the union about her treatment in this matter, but the grievance was ultimately dropped.

Soon after this incident, plaintiff discovered that she was pregnant again, and notified Sergeant Gerald Burnham. Sergeant Burnham responded, "Gee, thanks." He explained at trial that he meant that just as the department had gotten over the problems and turmoil of plaintiff's first pregnancy plaintiff became pregnant again. Plaintiff informed Lieutenant Hesse that she would need new uniforms because she was outgrowing her old ones. Plaintiff recommended that she receive uniform pants with an elastic panel in the stomach, a

uniform blouse to be worn over that, and a shoulder holster for her gun and other equipment. Deputy Chief Faulkner vetoed her idea for safety reasons; he explained that if plaintiff were to wear her shirttails untucked, an assailant could easily grab her. He also believed that shoulder holsters were not safe. Hesse told plaintiff that the department would not supply her with pants every time she grew bigger. He offered to ask the male officers of various sizes to lend their pants to plaintiff through her pregnancy. Plaintiff refused this offer. Plaintiff was instead issued pants with a 34-inch waist and 45-inch hips, and was told she could "grow into" them.

In September 1990, plaintiff's doctor again restricted plaintiff's activities. Plaintiff admitted that the restrictions rendered her unable to fulfill the duties of a road patrol officer. At this same time, a temporary assistant court officer position was posted. Plaintiff asked Hesse if she could be transferred to that position during her pregnancy, because the job involved mostly desk work and did not require her to wear a uniform. Hesse told her that the collective bargaining agreement did not permit the department to post temporary positions and that the posting had been a mistake. Plaintiff was not permitted to fill that position, and subsequently left work for the remainder of her second pregnancy at the end of September.

In January or February 1991, Officer Vier Wirwille filled the assistant court officer position on a temporary, emergency basis to help with the enormous backlog. Contrary to plaintiff's testimony, Wirwille stated that the job was not sedentary—a large part of the job involved handling prisoners, including transporting them to and from court, and restraining them within the court building. The job was then reposted as a permanent posi-

tion. All officers interested in the position were required to take both a written and an oral examination; they were also given points for seniority. The job was to be awarded to the officer who received the highest combined score. Plaintiff applied for it, and took the oral part of the examination.[1] She was unable to take the written half of the examination, however, because it was scheduled two days after she gave birth in April. Julie Cote, the employee who scheduled the written examination, testified that she was unaware that the date conflicted with plaintiff's due date, and that if plaintiff had informed her of the conflict, she would have rescheduled it. Cote and Klaver both testified that even if plaintiff had scored one hundred percent on the written examination, she would have only received the third highest score. The position went to Officer Jelley, who received the highest combined score.

Plaintiff returned to work after her second pregnancy on October 13, 1991.

On the basis of these events, plaintiff sued defendants under the HCRA and the CRA, alleging pregnancy discrimination, sex discrimination, and sexual harassment. Plaintiff's HCRA claim was dismissed on defendants' motion for summary disposition. Her claims under the CRA went to the jury. The jury found that plaintiff failed to prove sex discrimination, but awarded plaintiff $5,000 for her sexual harassment claim.

## II. HCRA CLAIMS

Plaintiff first contends that the trial court erred in granting defendants' motions for summary dis-

---

[1] The oral examination was conducted by persons not connected to the city and who did not know the candidates or have any background information about them.

position of her two HCRA claims. Plaintiff alleged
that she was discriminated against because of her
two pregnancies. Regarding the first pregnancy,
the trial court found that plaintiff did not suffer
from a handicap because her pregnancy did, in
fact, affect her ability to do the job. As for the
second pregnancy, the court held that pregnancy is
not a handicap under the HCRA as a matter of law.
Plaintiff asserts that the trial court's two rulings
are erroneous.

Under the HCRA, as amended by 1980 PA 478,
effective January 20, 1981, which applies to plain-
tiff's first pregnancy, "handicap" is defined as

> a determinable physical or mental characteristic
> of an individual or a history of the characteristic
> which may result from disease, injury, congenital
> condition of birth, or functional disorder which
> characteristic . . . is unrelated to the individual's
> ability to perform the duties of a particular job or
> position, or is unrelated to the individual's qualifi-
> cations for employment or promotion. [MCL
> 37.1103(b)(i); MSA 3.550(103)(b)(i).]

Plaintiff's second pregnancy occurred in 1990,
after the June 25, 1990, effective date of 1990 PA
121, which amended the HCRA. Under the amended
statute, "handicap" is defined as

> [a] determinable physical or mental characteristic
> of an individual, which may result from disease,
> injury, congenital condition of birth, or functional
> disorder, if the characteristic . . . substantially
> limits 1 or more of the major life activities of that
> individual and is unrelated to the individual's
> ability to perform the duties of a particular job or
> position . . . . [MCL 37.1103(e)(i)(A); MSA
> 3.550(103)(e)(i)(A).]

Under both these definitions, a condition related

to an individual's ability to perform the duties of a job is not a handicap within the meaning of the HCRA. *Carr v General Motors Corp,* 425 Mich 313, 321-322; 389 NW2d 686 (1986); *Hatfield v St Mary's Medical Center,* 211 Mich App 321; 535 NW2d 272 (1995). In this case, plaintiff admitted at trial that her doctor's restrictions rendered her unable to fulfill the job requirements of a road patrol officer. However, she contends that she should have been allowed to transfer to a more sedentary job during her pregnancy, such as the crime prevention officer or the assistant court officer position.

In *Hall v Hackley Hosp,* 210 Mich App 48; 532 NW2d 893 (1995), the plaintiff made a similar argument under the HCRA. The plaintiff suffered from asthma. She worked in the separate psychiatric center of the defendant hospital. Unlike the rest of the hospital, smoking was allowed in two designated rooms of the psychiatric center. The plaintiff was required to enter those rooms as part of her job. The smoke permeated the rest of the center as well. This environment aggravated the plaintiff's asthma, and her doctor instructed her not to work in a smoke-filled environment. The defendant, however, refused to transfer the plaintiff to a smoke-free area of the hospital. This Court affirmed the grant of the defendant's motion for summary disposition. It held, in part, that the duty to accommodate under the HCRA did not require the defendant to place the plaintiff in another job in the hospital because the duty to accommodate imposed under the HCRA does not extend to a new job placement.[2] *Id.* at 57, quoting

---

[2] The Court also held that the defendant had no duty to ban smoking in the center to accommodate the plaintiff's asthma. It cautioned, however, that this part of its holding was narrow and turned on the specific facts of the case. The case was unique because

*Rancour v Detroit Edison Co,* 150 Mich App 276, 279; 388 NW2d 336 (1986).

Relying on *Hall,* we conclude that defendants' duty to accommodate plaintiff did not extend to placing her in a position other than road patrol officer during pregnancy, under either the pre-1990 or the post-1990 HCRA. Therefore, the trial court's grant of defendants' motions for summary disposition of plaintiff's two HCRA claims is affirmed.[3]

### III. CRA—SEX DISCRIMINATION

Plaintiff next appeals the trial court's evidentiary ruling concerning her CRA sex discrimination claim. Plaintiff proceeded under a disparate treatment theory. Her main argument was that the no-light-duty policy was applied differently to men. At trial, plaintiff sought to introduce evidence that other city employees were permitted to work in light-duty positions while disabled from their normal jobs. The trial court suppressed this evidence, reasoning that plaintiff could only introduce evidence about the manner in which the no-light-duty policy was applied to other members of plaintiff's collective bargaining unit. We review evidentiary rulings for an abuse of discretion. *Haberkorn v Chrysler Corp,* 210 Mich App 354, 361; 533 NW2d 373 (1995).

We hold that the trial court abused its discretion in suppressing this evidence, because it was relevant to plaintiff's theory of disparate treat-

---

the defendant presented evidence of sound medical reasons for permitting patients in the center to smoke, because of their acute psychotic illnesses. The defendant's position was that the patients' psychoses had to be addressed before their addiction to tobacco could be treated.

[3] Because our disposition of this issue relates equally to the pre-1990 and the post-1990 HCRA, we need not decide whether the trial court erred in concluding that pregnancy is not a handicap under the HCRA as a matter of law.

ment under the CRA. Relevant evidence is evidence that has any tendency to make the existence of a fact at issue more probable or less probable than it would be without the evidence. MRE 401; *Gingold v Berkley Clinic, PC,* 204 Mich App 148, 149; 514 NW2d 469 (1994).

The evidence regarding the manner in which the city treated employees outside plaintiff's bargaining unit was relevant to the issue of disparate treatment. The no-light-duty policy was a city-wide policy; therefore, evidence of how the city treated any of its male disabled employees was relevant to the issue whether plaintiff was treated disparately under the policy because of her gender. The court should not have confined plaintiff to proofs involving only her own collective bargaining unit.

The erroneous suppression of this evidence was not harmless, because it may have caused the jury to reject plaintiff's claims of disparate treatment. Therefore, we must remand for a new trial on the issue of sex discrimination under the CRA.

Plaintiff's issue regarding the disparate treatment jury instruction will be considered next, because it may arise again on remand. When the standard instructions do not properly cover an area, a trial court is required to give requested supplemental instructions if they properly inform the jury of the applicable law. *Sherrard v Stevens,* 176 Mich App 650, 655; 440 NW2d 2 (1988). However, it is error to instruct the jury on a matter not supported by the evidence. *Mills v White Castle Systems, Inc,* 199 Mich App 588, 591; 502 NW2d 331 (1992). The determination whether supplemental instructions are applicable and accurate is within the trial court's discretion. *Bordeaux v Celotex Corp,* 203 Mich App 158, 168-169; 511 NW2d 899 (1993).

The trial court did not err in rejecting plaintiff's

first supplemental instruction. That instruction essentially stated that the city was not legally prohibited under the CRA from treating pregnant employees more favorably than other employees. Because the CRA does not require preferential treatment of any member of a protected class, this instruction might have confused the jury about the law. Accordingly, the trial court properly refused to give this instruction. *Mills, supra* at 591.

We also find that the trial court properly rejected plaintiff's proposed third supplemental instruction, which set out the law for a disparate impact claim under the CRA. Plaintiff asserts that she proved at trial that the facially neutral no-light-duty policy had a disparate impact on women because a disabled woman would lose her prenatal and postnatal insurance benefits, while the pregnant disabled wife of an nondisabled male officer would not. As noted by defendants, this is not the proper comparison. Rather, plaintiff should have compared the benefits received by disabled male officers who did not work with the benefits she received when pregnant and unable to work. The evidence established that both groups lost their benefits after exhausting their sick, vacation, and personal time unless they paid for them. No disparate impact was shown. Thus, the trial court did not err in rejecting the jury instruction, because it was not supported by the evidence and likely would have misled and confused the jury. *Mills, supra* at 591.

### IV. CRA—SEXUAL HARASSMENT

Defendants assert by way of cross appeal that the trial court erred in denying their dispositive motions regarding plaintiff's claim of sexual harassment. Under the CRA,

[d]iscrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

* * *

(iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment. [MCL 37.2103(i)(iii); MSA 3.548(103) (i) (iii).]

Plaintiffs must prove five elements to prove this type of sexual harassment, known as a hostile work environment: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or did in fact substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Radtke v Everett,* 442 Mich 368, 382-383; 501 NW2d 155 (1993).

In this case, plaintiff was subjected to comments involving pregnancy, career choice, and child rearing. For example, she was told by her superiors, "you should have thought about raising a family before you made a career choice," "women should stay home for at least two years after having children," and "how can I give you more [benefits] for an intentional act [getting pregnant] than I give to officers who are injured in an accident?" When plaintiff informed Sergeant Burnham that she was pregnant for the second time, Burnham responded, "Gee, thanks." And, when plaintiff outgrew her uniform because of her pregnancy, she

was issued a huge pair of men's pants and told she could "grow into them."

Plaintiff meets the first element of her claim. All employees are inherently members of a protected class in hostile work environment cases because all persons may be discriminated against on the basis of sex. *Radtke, supra* at 383. Plaintiff also satisfies the second element of her claim. The record reflects that plaintiff was subjected to demeaning and offensive remarks and conduct concerning pregnancy and motherhood. Obviously, these remarks could only be made to a female employee.

The third element of a hostile work environment claim requires plaintiff to prove that she was subjected to unwelcome sexual conduct or communication. This is the crucial element in this case. The issue here is whether the offensive remarks and acts about pregnancy to which plaintiff was subjected are of a "sexual nature." Plaintiff did not argue at trial that she was subjected to sexual advances or requests for sexual favors; thus, she can succeed on this claim only if the harassment to which she was subjected constitutes other conduct "of a sexual nature." Plaintiff asserts that sexual harassment can be harassment based on pregnancy, pursuant to the definition of "sex" under the CRA. Under MCL 37.2201(d); MSA 3.548(201)(d), "sex" is defined as follows:

> "Sex" includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth that does not include nontherapeutical abortion not intended to save the life of the mother.

On the other hand, defendants contend that the various challenged incidents, while arguably cruel, are not overtly sexual in nature, and therefore are

not prohibited under the CRA. The meaning of the term unwelcome "sexual" conduct or communication under the CRA is an issue of first impression in Michigan.

This Court often turns to federal precedent interpreting title VII of the Civil Rights Act of 1964, 42 USC 2000e—2000e-17, for guidance when interpreting the CRA, although federal precedent is not binding when interpreting Michigan law. *Radtke, supra* at 381-382. Title VII does not specifically define sexual harassment as does the CRA. Rather, federal case law has created a cause of action for sexual harassment under the general prohibition against gender discrimination. 42 USC 2000e-2(a)(1); *Meritor Savings Bank, FSB v Vinson,* 477 US 57, 66-67; 106 S Ct 2399; 91 L Ed 2d 49 (1986). The Equal Employment Opportunity Commission (EEOC) guidelines, however, define sexual harassment. The definition of sexual harassment under the CRA strongly parallels language adopted by the EEOC.[4] Federal cases interpreting title VII have held that sexual harassment should not be defined narrowly and should not be limited to sexual advances or incidents with clearly sexual overtones. Rather, conduct constitutes sexual harassment under title VII if the harassment would not have occurred but for the victim's sex. See, e.g., *Hall v Gus Const Co,* 842 F2d 1010, 1013-1014 (CA 8, 1988), and the cases cited therein. Yet, unlike the general language of title VII, the CRA specifi-

---

[4] EEOC guidelines define "sexual harassment" as

[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. [29 CFR 1604.11(a).]

cally defines "sexual harassment" as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature. The Legislature's choice of language forecloses our reliance on title VII precedents to interpret sexual harassment under the CRA.

The primary rule of statutory construction is to determine and effectuate the intent of the Legislature through reasonable construction in consideration of the purposes of the statute and the object sought to be accomplished. *Gross v General Motors Corp,* 448 Mich 147, 158-159; 528 NW2d 707 (1995) (opinion of BRICKLEY, C.J.). The expressions used in a statute are to be taken in their natural and ordinary sense. *Id.* at 160. According to *Webster's New Twentieth Century Dictionary,* "sexual" means "of, characteristic of, or affecting sex, the sexes, the organs of sex and their functions, or sex instincts or drives." Thus, the dictionary definition of "sexual" is not helpful in resolving this issue, because it encompasses both plaintiff's and defendants' proposed meaning of the term.

Under the rule of ejusdem generis, where a statute contains general words that follow a designation of particular subjects, the meaning of the general words will be presumed to be restricted by the particular designation as including things of a similar kind, class, character, or nature as those specifically enumerated. *Richmond Twp v Erbes,* 195 Mich App 210, 222-223; 489 NW2d 504 (1992). Applying this rule of statutory construction, we find that the conduct challenged by plaintiff does not constitute sexual harassment. To interpret the words "or other conduct of a sexual nature" to mean any conduct or communication based on gender is inconsistent with the examples given in the statute—sexual advances, sexual favors—that all concern overtly sexual, as opposed to gender-

based, conduct.[5] The trial court erred in failing to grant defendants' motions for summary disposition and a directed verdict with regard to the issue of sexual harassment. We reverse and vacate the jury's verdict in favor of plaintiff on this issue.

Affirmed in part, reversed in part, and remanded for a new trial on the issue of sex discrimination. We do not retain jurisdiction.

---

[5] We emphasize, however, that the evidence of harassment based on plaintiff's pregnancy may be proof of sexual *discrimination.*