KOESTER v CITY OF NOVI

Docket No. 105508. Argued January 6, 1998 (Calendar No. 3). Decided June 17, 1998.

Karen Koester, a city of Novi road patrol officer, brought an action in the Oakland Circuit Court against the city and Police Chief Lee Begole, alleging discrimination under the pre- and post-1990 amendments of the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*, and sex discrimination and sexual harassment under the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* The plaintiff claimed that the city had failed to accommodate her handicap, a lifting restriction attributable to pregnancy, and had treated her differently than male officers who were injured or disabled, and that remarks related to her pregnancy rendered a hostile work environment as a result of sexual harassment. The court, Gene Schnelz, J., granted summary disposition for the defendants with respect to the handicappers' claim, and entered judgment on a jury verdict for the defendants regarding the sex discrimination claim and for the plaintiff regarding the sexual harassment claim. The Court of Appeals, CORRIGAN, P.J., and MARKEY and J. R. ERNST, JJ., affirmed the summary dispositions for the discrimination claims, reversed the jury's verdict with regard to the sexual harassment claim, and remanded for a new trial respecting the sex discrimination claim (Docket No. 161135). The plaintiff appeals.

In an opinion by Justice CAVANAGH, joined by Chief Justice MALLETT, and Justices BOYLE and KELLY, the Supreme Court *held*:

Pregnancy, standing alone, is not a handicap under the Handicappers' Civil Rights Act because it is not a substantial limitation of a major life activity. Harassing comments and conduct relating to a woman's pregnancy may give rise to a claim of sexual harassment as defined by the Michigan Civil Rights Act.

1. In order to determine whether a pregnant woman is handicapped according to the definition contained in the HCRA, a reviewing court must examine the particular facts and circumstances of the pregnancy to determine whether it substantially limits one or more major life activities. Pregnancy, by itself, typically does not substantially limit one or more of a person's major life activities.

While, at times, certain conditions associated with pregnancy may rise to the level of a substantial limitation of a major life activity, in this case, the plaintiff has not stated a claim under the HCRA. The restriction limiting the plaintiff's lifting abilities to twenty-five pounds is not a substantial impairment of a major life activity.

2. Harassment on the basis of a woman's pregnancy is sexual harassment. An unlawful employment action occurs whenever pregnancy is a motivating factor for adverse treatment in the workplace. In this case, the plaintiff presented an issue for the jury regarding whether she was harassed on the basis of her sex.

Affirmed in part and reversed in part.

Justice WEAVER, joined by Justices BRICKLEY and TAYLOR, concurring in part and dissenting in part, stated that negative comments regarding a woman's pregnancy do not necessarily give rise to a claim of sexual harassment. Although such comments certainly can be considered gender-based, they are not necessarily of a sexual nature so as to amount to sexual harassment.

While the Civil Rights Act includes pregnancy in its definition of sex, conduct or communication about pregnancy is not necessarily sexual in nature. Although sexual harassment technically may be a subset of sexual discrimination, a claim for sexual harassment requires different proofs, including proof of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature. Even though sexual harassment is always a form of sex discrimination, all cases of sex discrimination do not necessarily amount to sexual harassment.

Because the conduct challenged by the plaintiff was gender-based, as opposed to being overtly sexual, the trial court should have granted the defendant's motions for summary disposition and directed verdict with regard to the plaintiff's sexual harassment claim.

213 Mich App 653; 540 NW2d 765 (1995) affirmed in part and reversed in part.

*Akhtar & Sucher* (by *Jamil Akhtar*) for the plaintiff-appellant.

*Cummings, McClorey, Davis & Acho, P.C.* (by *Joseph Nimako* and *Thomas J. Laginess*), for the defendants-appellees.

Amicus Curiae:

*Kelman, Loria, Simpson, Will, Harvey & Thompson* (by *Ann Currey Thompson*) for Michigan Trial Lawyers Association.

CAVANAGH, J. In this case we are asked to determine two things: (1) whether plaintiff has stated a claim under the Handicappers' Civil Rights Act (HCRA), MCL 37.1101 *et seq.*;    MSA 3.550(101) *et seq.*, and (2) whether comments and harassing conduct relating to a woman's pregnancy can give rise to a claim for sexual harassment as defined by the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

We hold that pregnancy, standing alone, is not a handicap under the HCRA because it is not a substantial limitation of a major life activity. We also hold that harassing comments and conduct relating to a woman's pregnancy may give rise to a claim of sexual harassment as defined by the CRA.

### I. FACTS

The facts in this case were presented by the Court of Appeals as follows:

> In 1981, defendant city of Novi employed plaintiff as a police officer assigned to road patrol. In 1984, the city adopted a city-wide no-light-duty policy, which prohibited disabled employees from returning to work until able to perform their regular duties. The no-light-duty policy applied to all city employees. A disabled city employee unable to perform the requirements of the job was permitted to use sick, vacation, and other leave time to remain on the payroll. Once an employee's accumulated leave time was exhausted, the employee would be placed on an unpaid leave of absence. Benefits would be discontinued at this point unless the employee paid for them.

Plaintiff met with Craig Klaver, the assistant city manager
in charge of personnel, to discuss pregnancy leave in 1986.
Klaver explained to plaintiff that the above policies applied
to pregnancy, just like any other condition that rendered an
employee unable to perform her job duties. Klaver asked
plaintiff, "[H]ow can I give you more for an intentional act
than for an officer who is accidentally injured?" Klaver later
explained that he meant the no-light-duty policy would cer-
tainly apply to someone who made a conscious decision to
raise a family, if it applied to someone who was acciden-
tally injured in an accident. He also informed plaintiff that
no official maternity leave policy existed. Plaintiff testified
that Klaver then said, "You should have thought about hav-
ing kids before you made your career choice." Klaver, how-
ever, denied saying this. Klaver testified that no exceptions
were ever made to the no-light-duty policy. He recalled one
instance where an officer went to a training program while
disabled; however, the officer did so without the city's
knowledge and was admonished not to do so again.
Another officer, Ron Roy, was permitted to come to work
wearing an orthopedic shoe after foot surgery. Roy testified,
though, that the shoe did not inhibit his ability to perform
his job duties.

Plaintiff became pregnant in early 1988. She was the first
pregnant officer in the history of the city. Plaintiff met with
defendant Chief Lee Begole to discuss her condition. Plain-
tiff testified that Begole told her that he believed women
should stay at home with their children for two or three
years and should not work while pregnant.

In March 1988, after plaintiff experienced some problems
early in her pregnancy, plaintiff's doctor restricted her from
lifting more than twenty-five pounds and instructed her to
avoid trauma to the abdominal area. Plaintiff admitted that
these restrictions prevented her from fulfilling the physi-
cally demanding job requirements of a road patrol officer.
Consequently, plaintiff took a leave of absence from work.
Plaintiff testified that she was ordered off work by Lieuten-
ant Starnes; Starnes and Deputy Chief Richard Faulkner
stated that plaintiff voluntarily left work. Plaintiff's sick,
vacation, and personal time was exhausted in July 1988,

after which she went on unpaid leave. Her long-term disability payments began in September 1988 and terminated in December 1988.

Shortly after going on leave, plaintiff saw an opening posted for a crime prevention officer, a more sedentary job than that of a road patrol officer. Plaintiff requested the position, but it ultimately went to Officer Robert Gatt. Even Gatt had suggested that plaintiff hold the position during her pregnancy, but the city refused, stating that it would be too costly to train plaintiff for the position, only to have her leave it a few months later.

Plaintiff's due date was late October or early November 1988. In order to be assured of a day shift upon her return to work, plaintiff testified that she put in a bid for the day shift in October 1988 while she was still on leave. At that time, plaintiff had the fifth-highest seniority of all the road patrol officers. Because of her seniority, plaintiff would have been assured her choice of shifts had she been working. Plaintiff stated that the practice when senior officers returned from disability was to bump other officers to give the senior officers their choice of shift. Lieutenant Thomas Hesse, who replaced Starnes, told plaintiff, however, that he would put her on the night shift or any shift where she was needed. Plaintiff ultimately bid for, and received, a day shift spot in April 1989, the next time bids were accepted for shifts.

Upon returning to work in April 1989, plaintiff testified that she was singled out for failing to write enough moving violations, for using the restrooms at the fire station and Twelve Oaks Mall, and for failing to have her badge number on her uniform pants. Plaintiff asserted that she had never been disciplined or reprimanded before she became pregnant. Defendants denied treating plaintiff any differently than other officers, and pointed out that all the officers were eventually instructed to spend less time socializing at the mall and the fire department, and to place their badge numbers on their uniforms.

Plaintiff was issued a written reprimand for an incident that occurred in July 1990 during the city's "Fifties Festival." Plaintiff testified that, as a senior officer, she was asked to

volunteer to work overtime during the festival. Because of her seniority, the collective bargaining agreement permitted plaintiff to decline the extra work. Plaintiff initially agreed to work, but when she could not find a baby-sitter, she called the station and declined the overtime. Defendants' witnesses, however, stated that plaintiff violated a direct order to work the festival. Plaintiff filed a grievance with the union about her treatment in this matter, but the grievance was ultimately dropped.

Soon after this incident, plaintiff discovered that she was pregnant again, and notified Sergeant Gerald Burnham. Sergeant Burnham responded, "Gee, thanks." He explained at trial that he meant that just as the department had gotten over the problems and turmoil of plaintiff's first pregnancy plaintiff became pregnant again. Plaintiff informed Lieutenant Hesse that she would need new uniforms because she was outgrowing her old ones. Plaintiff recommended that she receive uniform pants with an elastic panel in the stomach, a uniform blouse to be worn over that, and a shoulder holster for her gun and other equipment. Deputy Chief Faulkner vetoed her idea for safety reasons; he explained that if plaintiff were to wear her shirttails untucked, an assailant could easily grab her. He also believed that shoulder holsters were not safe. Hesse told plaintiff that the department would not supply her with pants every time she grew bigger. He offered to ask the male officers of various sizes to lend their pants to plaintiff through her pregnancy. Plaintiff refused this offer. Plaintiff was instead issued pants with a 34-inch waist and 45-inch hips, and was told she could "grow into" them.

In September 1990, plaintiff's doctor again restricted plaintiff's activities. Plaintiff admitted that the restrictions rendered her unable to fulfill the duties of a road patrol officer. At this same time, a temporary assistant court officer position was posted. Plaintiff asked Hesse if she could be transferred to that position during her pregnancy, because the job involved mostly desk work and did not require her to wear a uniform. Hesse told her that the collective bargaining agreement did not permit the department to post temporary positions and that the posting had been a

mistake. Plaintiff was not permitted to fill that position, and subsequently left work for the remainder of her second pregnancy at the end of September.

In January or February 1991, Officer Vier Wirwille filled the assistant court officer position on a temporary, emergency basis to help with the enormous backlog. Contrary to plaintiff's testimony, Wirwille stated that the job was not sedentary—a large part of the job involved handling prisoners, including transporting them to and from court, and restraining them within the court building. The job was then reposted as a permanent position. All officers interested in the position were required to take both a written and an oral examination; they were also given points for seniority. The job was to be awarded to the officer who received the highest combined score. Plaintiff applied for it, and took the oral part of the examination. She was unable to take the written half of the examination, however, because it was scheduled two days after she gave birth in April. Julie Cote, the employee who scheduled the written examination, testified that she was unaware that the date conflicted with plaintiff's due date, and that if plaintiff had informed her of the conflict, she would have rescheduled it. Cote and Klaver both testified that even if plaintiff had scored one hundred percent on the written examination, she would have only received the third highest score. The position went to Officer Jelley, who received the highest combined score.

Plaintiff returned to work after her second pregnancy on October 13, 1991.

On the basis of these events, plaintiff sued defendants under the HCRA and the CRA, alleging pregnancy discrimination, sex discrimination, and sexual harassment. Plaintiff's HCRA claim was dismissed on defendants' motion for summary disposition. Her claims under the CRA went to the jury. The jury found that plaintiff failed to prove sex discrimination, but awarded plaintiff $5,000 for her sexual harassment claim. [213 Mich App 653, 655-660; 540 NW2d 765 (1995).]

The Court of Appeals affirmed the trial court's grant of summary disposition regarding the two HCRA

claims. However, the Court remanded the case for a new trial with regard to the sex discrimination claim under the CRA and reversed the jury verdict on the sexual harassment claim.

## II. PREGNANCY IS NOT A HANDICAP UNDER THE HCRA

Plaintiff alleges that she was discriminated against in violation of the HCRA on the basis of her pregnancy. However, defendant police department alleges that Koester's pregnancy is not a handicap; therefore, she is not entitled to protection under the act. We agree with defendant.

Handicap is defined by the 1990 HCRA as:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

> *               *               *

> (l) "Unrelated to the individual's ability" means, with or without accommodation, an individual's handicap does not prevent the individual from doing 1 or more of the following:
>
> (i) . . . Performing the duties of a particular job or position. [MCL 37.1103(e), (l); MSA 3.550(103)(e), (l).]

On June 25, 1990, the Michigan Legislature amended the HCRA in response to our holding in *Carr v General Motors Corp*, 425 Mich 313; 389 NW2d 686 (1986). It added the term "with or without accommo-

dation" to the section defining "[u]nrelated to the individual's ability." As stated by the statute, the term "with or without accommodation" relates to whether a person is handicapped, but it does not relate to the duty to accommodate. Therefore, the addition of the language "with or without accommodation" "lowers the threshold of proof of a handicap."

However, even with the amendments to the HCRA, pregnancy, by itself, does not typically "substantially limit[] 1 or more of the major life activities" of an individual. We recognize that at times, certain conditions associated with pregnancy may rise to the level of a substantial limitation of a major life activity. Therefore, in order to determine whether a pregnant person is "handicapped" according to the definition contained in the HCRA, a reviewing court must examine the particular facts and circumstances of the pregnancy to determine whether it substantially limits one or more major life activities of the employee.

In this case, because of plaintiff's pregnancy, she was placed on a restriction limiting her from lifting twenty-five pounds or more. She claims that she was removed from her road patrol duties because of her inability to lift twenty-five pounds. We hold that the restriction limiting plaintiff's lifting abilities to twenty-five pounds is not a substantial impairment of a major life activity. Therefore, plaintiff has not stated a claim under the HCRA.[1]

---

[1] Because plaintiff is not handicapped, we do not address her other claims arising under the HCRA.

### III. SEXUAL HARASSMENT AND PREGNANCY

In addition to her claim under the HCRA, plaintiff also claims that she was harassed on the basis of her sex because of her pregnancy. Under the express language of the Michigan statute, analogous federal law, and the legislative history of the Michigan Civil Rights Act, we hold that harassment on the basis of a woman's pregnancy is sexual harassment.

#### A. THE PLAIN LANGUAGE OF THE MICHIGAN CIVIL RIGHTS ACT

The Michigan Civil Rights Act[2] provides:

> An employer shall not do any of the following:
>
> Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . . .

In 1978, the Legislature amended the act and stated, " 'Sex' includes, but is not limited to, pregnancy . . . ." MCL 37.2201(d); MSA 3.548(201)(d). The act states, "Discrimination because of sex includes sexual harassment . . . ." MCL 37.2103(i); MSA 3.548(103)(i).

We find that there was no reason for the Court of Appeals to apply the rule of "ejusdem generis" where the language of the act clearly and unequivocally defines "sex" as including pregnancy. Apparently, the Court of Appeals has found the term ·"sexual nature" to be ambiguous. However, to say that comments of a "sexual nature" do not include comments about a

---

[2] MCL 37.2202(1)(a); MSA 3.548(202)(1)(a).

woman's pregnancy ignores the specific definition of
sex as contained in the act.

Sexual harassment is merely a subset of sexual dis-
crimination. As proof, our Legislature stated,
"[d]iscrimination because of sex includes sexual har-
assment . . . ." MCL 37.2103(i); MSA 3.548(103)(i).
Other courts have also recognized that discrimination
on the basis of a woman's pregnancy and sexual
harassment are "two subsets of sex discrimination."
*Hunt-Golliday v Metropolitan Water Reclamation
Dist of Greater Chicago*, 104 F3d 1004, 1006 (CA 7,
1997).[3] Unlawful employment practices occur "when-
ever pregnancy is a motivating factor for an adverse
employment decision." *Id.* at 1010. These principles
are entirely consistent with the express language of
the Civil Rights Act. As our statute specifically states,
"[a]n employer shall not . . . discriminate against an
individual with respect to . . . a term, condition, or
privilege of employment, because of . . . sex" where
" '[s]ex' includes, but is not limited to, pregnancy" and
"[d]iscrimination because of sex includes sexual
harassment . . . ."

### B. THE FEDERAL INFLUENCE

To fully understand the significance of the language
of our Civil Rights Act, first it is necessary to examine
the analogous federal Civil Rights Act. Our courts

---

[3] While the dissent recognizes that "sexual harassment may be techni-
cally a 'subset of sexual discrimination,' " it refuses to allow recovery
because "pregnancy harassment" is not spelled out under the act. Under
the dissent's reasoning, claims of racial harassment would also fail
(despite being recognized by the federal courts), because the act prohibits
racial "discrimination" not "racial harassment." This interpretation defies
logic. See *Harrison v Metropolitan Government of Nashville & Davidson
Co, Tennessee*, 80 F3d 1107 (CA 6, 1996), and *Snell v Suffolk Co, New
York*, 782 F2d 1094 (CA 2, 1986) (allowing a claim for racial harassment).

have consistently relied on the federal judiciary for guidance when addressing the Michigan Civil Rights Act. *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505, 525; 398 NW2d 368 (1986); *Civil Rights Dep't ex rel Cornell v Edward W Sparrow Hosp Ass'n*, 423 Mich 548, 559; 377 NW2d 755 (1985).

In 1976, the United States Supreme Court in *General Electric Co v Gilbert*, 429 US 125; 97 S Ct 401; 50 L Ed 2d 343 (1976), upheld as nondiscriminatory an employee disability plan that excluded pregnancy-related disabilities under title VII. Promptly after that decision, the United States Congress amended title VII through enactment of the Pregnancy Discrimination Act and clarified that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy . . . ." Pub L No 95-555, 92 Stat 2076, codified as amended at 42 USC 2000e(k).

The United States Supreme Court has not had occasion to address the specific question presented here: whether harassment on the basis of pregnancy is sexual harassment. However, because title VII was amended to include pregnancy, the federal courts have held that harassment on the basis of pregnancy is sexual harassment. In *Garrett v Executive Fund Life Ins Co*, 1996 US App LEXIS 6549, *3 (CA 6, 1996), the United States Court of Appeals for the Sixth Circuit stated in an opinion per curiam that where a complainant alleges sex discrimination on the basis of gender and pregnancy, "she may proceed on a sexual harassment theory." It stated that proof of sexual harassment is one way to show sex discrimination. *Id.* In *EEOC v Hacienda Hotel*, 881 F2d 1504, 1515, n 8 (CA 9, 1989), the United States Court of

Appeals for the Ninth Circuit held, "In light of the amendment to Title VII to include pregnancy-based discrimination within the definition of sex-based discrimination . . . remarks about the claimants' pregnancies can be construed as a form of sexual harassment."

In *Mentch v Eastern Savings Bank, FSB*, 949 F Supp 1236, 1245-1246 (D Md, 1997), the defendant argued that there exists no cause of action for "pregnancy harassment." The court stated:

> As a matter of syntax, [the defendant] is correct. As a matter of law, however, extant judicial construction of Title VII exposes [the defendant's] argument as flawed.
>
> *       *       *
>
> As evidence of [Congress'] intent, when the Supreme Court upheld as nondiscriminatory an employee disability plan that excluded pregnancy-related disabilities . . . Congress promptly amended Title VII through the enactment of the Pregnancy Discrimination Act . . . . A claim of pregnancy harassment fits logically under Title VII as amended.
>
> *       *       *
>
> To be sure, the phrase "sexual harassment" can be a misnomer. As several [federal] circuits have now recognized, the touchstone of an actionable Title VII sexual harassment claim is not whether the offensive conduct includes "sexual advances or . . . other incidents with clearly sexual overtones." . . . The critical inquiry "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." [*Id.* (citations omitted), quoting *Harris v Forklift Systems, Inc*, 510 US 17, 25; 114 S Ct 367; 126 L Ed 2d 295 (1993).]

In *Donaldson v American Banco Corp, Inc*, 945 F Supp 1456, 1461 (D Colo, 1996), the court stated:

[T]he terms "because of sex" or "on the basis of sex"
include, but are not limited to, because of or on the basis of
pregnancy, childbirth, or related medical conditions. There-
fore, "sexual harassment" includes pregnancy-based harass-
ment. [Internal quotations omitted.][4]

In accord with this reasoning, just this term, the
United States Supreme Court had occasion to con-
sider whether same-sex harassment is actionable
under title VII. In *Oncale v Sundowner Offshore Ser-
vices, Inc*, 523 US 75; 118 S Ct 998; 140 L Ed 2d 201
(1998), a unanimous Supreme Court agreed that
same-sex harassment is discrimination on the basis of
sex under title VII. Justice Scalia, writing for the
Court, stated that title VII not only covers "terms" and
"conditions" in the narrow contractual sense, but
" 'evinces a congressional intent to strike at the entire
spectrum of disparate treatment of men and women
in employment.' *Meritor Savings Bank, FSB v Vin-
son*, 477 US 57, 64; 106 S Ct 2399; 91 L Ed 2d 49
(1986) (citations and internal quotation marks omit-
ted)." *Id.*, 118 S Ct 1001.

The Court criticized the holding of the United
States Court of Appeals for the Fourth Circuit that
harassment claims are actionable only if the plaintiff
can prove that the harasser was presumably "moti-
vated by sexual desire." *Id.*, 118 S Ct 1002. It stated
that, instead, discrimination "because of . . . sex"
includes sexual harassment of any kind that meets
the statutory requirements.

The Court held that title VII

---

[4] The dissent fails to cite any case from the federal courts stating that
harassment on the basis of pregnancy is not actionable even if it creates a
hostile work environment.

is directed only at "discriminat[ion] . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." [*Id.*, 118 S Ct 1002 (citations omitted).]

Further, the Court recognized that courts and juries have found that in most male-female sexual harassment, the challenged conduct typically involves explicit or implicit proposals of sexual activity; "[*b*]*ut harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex*." *Id.*, 118 S Ct 1002 (emphasis added).

A trier of fact may find sexual harassment when "the harasser is motivated by general hostility to the presence of women in the workplace." *Id.*, 118 S Ct 1002. The bottom line in sexual harassment claims is that

he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discriminat[ion] . . . because of . . . sex." [*Id.*, 118 S Ct 1002.]

### C. THE LEGISLATIVE HISTORY OF MICHIGAN'S CIVIL RIGHTS ACT

It is not coincidental that the Michigan Legislature amended the Civil Rights Act in 1978 to state that "sex" includes pregnancy, shortly after Congress amended title VII to include pregnancy. Indeed, our legislative history of the Civil Rights Act reveals that the section stating that "sex" includes pregnancy was

added in specific response to the United States Supreme Court decision in 1976 stating otherwise. The 1978 House Legislative Analysis states that "[c]larification is needed regarding pregnancy benefits because of a 1976 U.S. Supreme Court decision [*General Electric Co v Gilbert, supra*] concerning pregnancy benefits . . . ." Fourth Analysis, HB 5257, May 22, 1978. As the legislative history indicates, as of 1978 at least twelve other states clarified their human rights statutes to include pregnancy in response to the Court's ruling.

Under the express language of the Michigan statute, analogous federal law, and the legislative history of the Civil Rights Act, we hold that sexual discrimination includes harassment on the basis of a woman's pregnancy.

### D. PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT

Karen Koester was only the second female officer in the history of the city's police department. Until 1990, she had never been disciplined and had received numerous departmental recommendations. However, shortly after she married, trouble began to arise between her and her supervisors regarding her being pregnant and starting a family.

In 1986, Koester met with the Assistant City Manager in charge of personnel, Craig Klaver, to discuss options for pregnancy leave. During that meeting, Klaver advised Koester that "You should have thought about having a family before you made your career choice." He also stated, "How can I give you more for an intentional act than for an officer who is accidentally injured." In 1988, plaintiff met with the Chief of the Novi Police Department, defendant Lee Begole, to

discuss her pregnancy. Begole advised plaintiff that he believed "A woman should stay home two to three years with her children." In 1989, Lieutenant Hesse forbade plaintiff from using the restrooms at the local fire stations, the police station, and the Twelve Oaks Shopping Center.

In July 1990, plaintiff was requested to work overtime for a "Fifties Festival." Although she was called at 8:30 A.M., the department wanted her to report for duty that evening at 7:00 P.M. Plaintiff tried for four hours to find a babysitter, but was unable to do so. At 12:30 P.M. she informed her shift sergeant that she could not report for duty that day. Shortly thereafter, Lieutenant Hesse called plaintiff into the station, with a union representative present, and suspended her for not reporting to work that Saturday. Interestingly, the union representative told Lieutenant Hesse that he called in at 3:00 P.M. and requested to work overtime; however, the shift commander told him that all the positions had been filled. Later, a chief's hearing took place in which, over the objection of the captain, the suspension was reduced to a written reprimand.

In August 1990, plaintiff notified her shift commander that she was pregnant a second time. Sergeant Burnham's response was "Gee, thanks." On August 31, 1990, plaintiff requested a new uniform to wear during her pregnancy. Lieutenant Hesse issued plaintiff two pairs of trousers with a thirty-four-inch waist and forty-five-inch hips. When plaintiff complained, Lieutenant Hesse told her to see the male officers and ask them for their "used" uniforms. All these allegations relating solely to the harassment of plaintiff, were coupled with the facts regarding the city's refusal to allow plaintiff to do light-duty work

or transfer to positions for which she was qualified and that were vacant.

On the basis of these facts, we hold that plaintiff presented an issue for the jury regarding whether she was harassed on the basis of her sex. As stated earlier, an unlawful employment action occurs whenever pregnancy is a motivating factor for adverse treatment in the workplace. For these reasons, we reverse the decision of the Court of Appeals and reinstate the jury verdict for plaintiff Koester's sexual harassment claim.

### IV. SEX DISCRIMINATION JURY INSTRUCTIONS

Plaintiff also argues that the trial court should have given two jury instructions that she proposed. The first proposed jury instruction rejected by the trial court read:

> The Defendants are not legally restrained or otherwise prohibited from treating pregnant employees better than or more favorable than other employees who have non-work related injuries or illnesses. The Michigan Elliott-Larsen Civil Rights Act prohibits discrimination on behalf of pregnancy, but does not prevent employers from treating pregnant employees more beneficially than it treats other employees. *Aubrey v Aetna Life Ins Co*, 886 F2d 119 (CA 6, 1989); *Harness v Hartz Mountain Corp*, 877 F2d 1307 (CA 6, 1989).

The Court of Appeals affirmed the trial court's refusal to give this instruction, reasoning that because the CRA does not require preferential treatment of any member of a protected class, the instruction may have confused the jury. We agree. Because the proposed instruction could have been interpreted as implying a requirement of preferential treatment for

pregnant employees, the trial court did not abuse its discretion in rejecting the instruction.

Plaintiff also argues that the trial court erred in rejecting an instruction regarding plaintiff's disparate impact claim that stated:

> Plaintiff Karen Koester also contends that her alleged discrimination based upon the fact that she is a female can also be proven under the disparate impact theory.
>
> *      *      *
>
> In order to establish a prima facie case of disparate impact, the Plaintiff must show that the City's leave of absence policy and no light duty policy impacted more severely or harshly on pregnant Officers than male Officers who incurred injuries or illnesses. If the Plaintiff, Karen Koester, makes this showing, the employer, City of Novi, must then meet the burden of showing that the leave of absence and no light duty policy plainly shows a relationship to the goals of the policy in question. *Smith v Conrail Corp*, 168 Mich App 773 [425 NW2d 220] (1988); *Farmington Ed Ass'n v Farmington School Dist*, 133 Mich App 566 [351 NW2d 242 (1984)].

It should be noted that plaintiff raised two issues in the Court of Appeals regarding sex discrimination: a disparate treatment theory and a disparate impact theory, both of which relate in part to a no-light-duty policy. The Court of Appeals remanded the issue of disparate treatment to the trial court for a new trial on that issue alone. We granted leave with respect to the propriety of a jury instruction relating solely to the disparate impact theory.

Under a disparate impact theory *only*, the no-light-duty policy does not affect women more severely than it does men. When male officers who lost their benefits after exhausting leave are compared with

female officers who lost benefits after exhausting leave, the evidence established that both groups lost benefits. Therefore, there was no disparate impact, and it was not an abuse of discretion to reject the instruction. The opinion does not reach the issue of disparate treatment under the no-light-duty policy because that issue was properly remanded to the trial court for a new trial.

## V. CONCLUSION

We affirm the decision of the Court of Appeals with respect to plaintiff's HCRA claim because pregnancy, by itself, is not a handicap. We reverse the decision of the Court of Appeals with respect to the plaintiff's sexual harassment claim because harassment on the basis of a woman's pregnancy is sexual harassment under the CRA.

MALLETT, C.J., and BOYLE and KELLY, JJ., concurred with CAVANAGH, J.

WEAVER, J. (*concurring in part and dissenting in part*). I concur with the majority's holding that pregnancy is not a handicap under the HCRA because a normal and healthy pregnancy is not a substantial limitation of a major life activity. Further, I concur with the majority's holding that the trial court properly rejected plaintiff's requested jury instructions.

I dissent from the majority's holding that negative comments regarding a woman's pregnancy necessarily give rise to a claim of sexual harassment. Although I believe negative comments regarding pregnancy certainly can be considered gender-based, such comments are not necessarily of a sexual nature so as to amount to sexual harassment.

The Court of Appeals reversed a jury verdict in favor of plaintiff Koester's sexual harassment claim. The Court of Appeals considered the Civil Rights Act (CRA) definition of sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when . . . [s]uch conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . environment." MCL 37.2103(i)(iii); MSA 3.548(103)(i)(iii). Applying the rule of ejusdem generis,[1] the Court of Appeals determined that the words "other . . . conduct of a sexual nature" must include things similar to sexual advances or sexual favors. The Court of Appeals concluded that the remarks at issue,[2] though insensitive, were not of a "sexual nature." Because the conduct challenged by plaintiff was gender-based, as opposed to "overtly sexual," the Court of Appeals concluded that the trial court should have granted defendant's motions for summary disposition and directed verdict with regard to plaintiff's sexual harassment claim. For this and the additional reasons

---

[1] "[W]here general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary (6th ed), p 517.

[2] The pregnancy-related remarks alleged by plaintiff were: (1) "You should have thought about having a family before you made your career choice," (2) "A woman should stay home two to three years with her child," (3) "How can I give you more [benefits] for an intentional act [getting pregnant] than I give for an officer who is accidentally injured," (4) "Gee, thanks," made in response to being informed of the second pregnancy, and (5) being told that she could "grow into [them]," when she outgrew her uniform and was issued a huge pair of men's pants.

below, I would affirm the judgment of the Court of Appeals.[3]

The majority claims to find support for its holding that comments regarding pregnancy, though not overtly sexual, may amount to sexual harassment by analogy to federal title VII law. A closer look at federal and Michigan law offers the majority little support.

The majority relies heavily on a principle it found in *Hunt-Golliday v Metropolitan Water Reclamation Dist of Greater Chicago*, 104 F3d 1004, 1006 (CA 7, 1997), to the effect that sexual harassment is a "subset" of sex discrimination. The majority finds this principle express within the CRA, where the statute states, "[d]iscrimination because of sex includes sexual harassment . . . ." MCL 37.2103(i); MSA 3.548(103)(i). However, the CRA goes on to define sexual harassment specifically as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature . . . ." MCL 37.2103(i); MSA 3.548(103)(i). I would find that, while the CRA includes pregnancy in its definition of "sex," MCL 37.2201(d); MSA 3.548(201)(d), conduct or communication about pregnancy is not necessarily "sexual" in nature. While sex-

---

[3] Even were I to conclude that comments relating to pregnancy could amount to sexual harassment under the CRA, I would find that plaintiff has failed to establish a hostile work environment. This Court has stated that

> [t]he essence of a hostile work environment action is that "one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of one sex that they alter the conditions of employment for them." [*Radtke v Everett*, 442 Mich 368, 385; 501 NW2d 155 (1993).]

While the comments made were insensitive, see n 2 *supra*, I would not find that they would create an atmosphere infused with hostility so as to alter the conditions of employment.

ual harassment technically may be a "subset" of sexual discrimination, a claim for sexual harassment requires different proofs including proof of "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature." Thus, while sexual harassment is always a form of sex discrimination, all cases of sex discrimination do not necessarily amount to sexual harassment.

More importantly, the federal cases relied on by the majority for the proposition that comments about pregnancy need not be overtly sexual to amount to sexual harassment do so by disavowing an EEOC regulation that defines sexual harassment with substantially the same language the Michigan Legislature adopted by statute. The EEOC guidelines define sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . ." 29 CFR 1604.11(a). *Mentch v Eastern Savings Bank, FSB*, 949 F Supp 1236 (D Md, 1997), a case relied on by the majority, does appear to hold that comments need not be overtly sexual to constitute sexual harassment. However, the cases relied on by *Mentch* for this proposition expressly recognize that the term "sexual" in the regulation means "explicitly sexual behavior." *McKinney v Dole*, 246 US App DC 376, 385, n 20; 765 F2d 1129 (1985); *Hall v Gus Construction Co, Inc*, 842 F2d 1010, 1014 (CA 8, 1988). Further these cases go on to conclude that the EEOC guidelines do not control the interpretation of the statute. *Id.* In effect, the courts rely on what it found to be broader statutory protections than that afforded by the regulation. In *Hall*, the court explained:

> Intimidation and hostility toward women because they
> are women can obviously result from conduct other than
> explicit sexual advances. Title VII "evinces a Congressional
> intention to define discrimination in the broadest possible
> terms. . . ." Although appellants correctly note that the def-
> inition of sexual harassment in the EEOC regulation empha-
> sizes explicitly sexual behavior, the regulations do not state
> that other types of harassment should not be considered.
> Furthermore, an enforcing agency's guidelines are not con-
> trolling upon the courts. [Citations omitted.]

Unlike title VII, the Michigan Legislature chose to sep-
arately and more specifically define sexual harass-
ment. This definition evinces an intent to address a
form of misconduct distinct from sex discrimination
and should control the resolution of this issue.
Instead, the majority subverts the CRA definition of
sexual harassment, thereby subverting the Legisla-
ture's intent.

I would affirm the decision of the Court of Appeals.

Brickley and Taylor, JJ., concurred with Weaver, J.