It was as impossible to destroy the life estate as it was to destroy the fee in an undivided fifth of the land. Estates are not destroyed nor barred, but the right of ownership is extinguished by conveyance. What the mortgagor and those succeeding to his interest had, the purchaser takes after regular foreclosure. In that way he is connected in title with all previous conveyances, and he holds as if all the owners of estates in the land, brought into the action, had executed conveyances to him. Section 1632, Code Civ. Proc.; Fogal v. Pirro, 17 Abb. Prac. 113; Green v. Mussey, 76 App. Div. 174, 78 N. Y. Supp. 434; Marshall v. United States Trust Co., 93 App. Div. 252, 261, 262, 87 N. Y. Supp. 747; Noonan v. Brennemann, 54 N. Y. Super. Ct. 337, 345; Georgia Pacific R. R. Co. v. Walker, 61 Miss. 481. It follows from this that the statute of limitations against plaintiff did not begin to run until the death of Benjamin Shevill, the life tenant, in 1891. Jefferson v. Bangs, 197 N. Y. 35, 90 N. E. 109; Jackson v. Johnson, 5 Cow. 74, 95, 96, 15 Am. Dec. 433; Jackson v. Harsen, 7 Cow. 323, 327, 17 Am. Dec. 517; Jackson v. Schoonmaker, 4 Johns. 390; Manolt v. Petrie, 65 How. Prac. 206, 209; Fogal v. Pirro, 17 Abb. Prac. 113; Randall v. Raab, 2 Abb. Prac. 307, 313; Bennett v. Garlock, 10 Hun, 328, 341; Gindrat v. Western Railway of Alabama, 96 Ala. 162, 11 South. 372, 19 L. R. A. 839.

It is urged that Hoople became mortgagee in possession. He had the title to four-fifths of the land. Plaintiff owned the other undivided fifth, subject to the life estate which Hoople held. If he was a mortgagee in possession, was he claiming as such to be in possession of the whole fee, or only that which the plaintiff owned? The plain fact is that he did not enter as mortgagee; he did not claim to be a mortgagee in possession of any part of the land; he did not claim it adversely against plaintiff, as he must have done in order to bar her. Becker v. McCrea, 193 N. Y. 423, 86 N. E. 463.

The judgment should be affirmed as to defendant-appellant Shevill, and reversed as to the plaintiff, and a new trial granted, with costs of the appeal to the plaintiff and costs below to abide the final award of costs. All concur.

---

## ROSENBAUM v. STIEBEL et al.

(Supreme Court, Appellate Division, First Department. March 11, 1910.)

1. BROKERS (§ 35*)—CONVERSION—SALE OF STOCKS CARRIED ON MARGINS.

Brokers carrying stocks on margins for a customer are liable for conversion, where they close them out without notice to him of sale, and after a mere call at his office for margins, and without any attempt to get his address, which could have been gotten of his partner at his office, he being away on a vacation, especially where the employé of the brokers, through whom the customer did business with them, told him before he started away that his account was all right, and that if anything happened he would take care of it.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 27; Dec. Dig. § 35.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. BROKERS·(§ 38*)—CONVERSION OF CUSTOMER'S STOCK—DAMAGES.

Within the rule that, where brokers make an unauthorized sale of a customer's stock, he may recover as damages the difference between the price at which it was sold and the highest market price within a reasonable time thereafter, the limit of such reasonable time is not the day when, immediately after receiving notice of the sale, and while he was still away in the country, he wrote them that unless his stocks were immediately restored he should commence criminal proceedings, but the day, two weeks later, when, having spent the entire day in the city, on his return, he wrote them that he should proceed against them unless the stocks were restored before noon of the next day, and that they should at noon of the next day close out part of such stocks by then selling them.

_ [Ed. Note.—For other cases, see Brokers, Dec. Dig. § 38.*]

Appeal from Judgment on Report of Referee.

Action by William A. Rosenbaum against Samuel J. Stiebel and others, partners as Stiebel, Hernsheim & Co. Judgment for plaintiff. All parties appeal. Affirmed.

See, also, 119 App. Div. 866, 103 N. Y. Supp. 1140; 134 App. Div. 953, 118 N. Y. Supp. 1138.

The following is the opinion of the referee:

The facts of this case are undisputed. The defendants were copartners conducting a stock brokerage business in the city of New York. The plaintiff was a customer of the firm, which had in its possession for his account on July 1, 1906, the following named securities, each of the par value of $100: Five hundred shares of the capital stock of the New York Central Railroad Company; 350 shares of the common capital stock of the American Sugar Refining Company; 100 shares of the common capital stock of the United States Reduction & Refining Company; 125 shares of the capital stock of the Amalgamated Copper Company. The plaintiff had two accounts, one styled "General Account" and the other "Special Account." In the latter were the 500 shares of the New York Central and 200 of the 350 shares of the American Sugar Refining Company. The remainder of the securities was carried in ·the "General Account." The defendants had the usual broker's lien upon these stocks for whatever advances or loans they had made to the plaintiff or for his account. Statements of these accounts were mailed to the plaintiff on the evening of June 30, 1906, at his business office in this city, which showed a total debit on the two accounts of $127,332.08. The value of the securities, according to the highest quotations of that day, was $127,593.75.

The plaintiff had no personal acquaintance with the members of the firm, excepting the defendant Hernsheim; his dealings having been through one Schlesinger, who was in the employ of the defendants, and who appears to have been a personal friend of the plaintiff. On the evening of June 29, 1906, the plaintiff left New York on his vacation, expecting to be gone about six weeks or two months, camping near Belgrade Lakes, Me. Before his departure on that day he notified Schlesinger "that he was going away on his vacation for six weeks or two months, talked with him (Schlesinger) about his (Rosenbaum's) account with the defendants, was told by Schlesinger that the account was all right, and that if anything happened he would take care of the account." The plaintiff remained absent from the city until August 31st, excepting that, having been called to Washington on July 28th by reason of the death of a relative, he stopped in New York on his return, arriving here from Washington on the morning of July 31st, and leaving again for Maine on the evening of the same day. It does not appear that on that day he saw any of the defendants or Schlesinger, although he wrote the firm a letter, hereinafter referred to.

After his conversation on June 29th with the defendants' representative, Schlesinger, the plaintiff heard nothing from him or from the defendants until about the middle of July, when he received notice from the defendants by mail at Belgrade Lakes that his stocks had been sold out by them on July

12th. Such sale was by the direction of the defendant Homan, and the plaintiff had no notice thereof, excepting as above stated. No request had been made to him by the defendants for additional margin. Notices of sale were mailed by the defendants on July 12th, addressed to the plaintiff at his New York office. Those notices were received the following day by the plaintiff's partner, Mr. Stockbridge, were opened by him, and remailed the same day to the plaintiff in Maine. The proof shows that the fluctuations in the prices of the stocks in question between June 29th and July 12th, were comparatively slight, but that, speaking generally, each of the stocks was somewhat lower on July 12th than it had been on June 29th. The lowest prices of July 11th, as compared with the lowest prices of June 29th, were for Amalgamated Copper, 92¾ as against 96½; American Sugar Refining Company, 127½ as against 129⅛; New York Central, 128 as against 133½; United States Reduction & Refining Company, 35 as against 36.

After the plaintiff's departure on June 29th, Schlesinger went to his office three or four times in the early part of July, but did not get his address. He did not indicate to any one in the office the reasons for his call. On the 11th day of July he went to the plaintiff's office, but the person he saw could give him no news as to when the plaintiff would be in New York. It does not appear that he made any inquiry as to the plaintiff's post office or telegraphic address in Maine, or made any effort to reach him excepting as above stated. On this subject the following facts are conceded: "During Mr. Rosenbaum's absence his partner, Mr. Stockbridge, was continually at the office of Rosenbaum & Stockbridge, and the two partners were in constant communication with each other. Mr. Rosenbaum's mail was all received and opened by Mr. Stockbridge and by him forwarded daily to Mr. Rosenbaum. * * * Prior to July 12, 1906, on request made by defendant Homan to Mr. Schlesinger that he communicate with Mr. Rosenbaum for additional margin, and on learning from Schlesinger that Mr. Rosenbaum was away in the woods, Mr. Homan suggested to Mr. Schlesinger that he send Mr. Rosenbaum a wire for margin. Mr. Schlesinger told Mr. Homan that he did not know how to reach him by wire, but that he (Schlesinger) would write to Mr. Rosenbaum. Mr. Schlesinger did not, however, write him. Mr. Rosenbaum's partner, Mr. Stockbridge, could have reached him by wire, knowing his telegraphic address; but means of telegraphic communication with Mr. Rosenbaum was not known to Mr. Schlesinger, and could only be ascertained through Mr. Stockbridge, or Mr. Rosenbaum's chief clerk, Mr. Chapin, who also always knew Mr. Rosenbaum's whereabouts and his post office and telegraphic address, and while he was camping in Maine Mr. Rosenbaum's telegraphic address was the same as his post office address. The telegraph office was about five miles from Mr. Rosenbaum's camp, which was within a quarter of a mile walking distance from a telephone line running to the telegraph office."

Upon this state of facts it is clear that under well-settled rules the defendants are liable for conversion of the plaintiff's securities. The defendants contend that by reason of the absence of the plaintiff from New York City and his inaccessibility they were relieved from the necessity of calling upon him for margin or giving him notice in advance of intent to sell his securities, and it is urged that they made every reasonable and proper effort to communicate with the plaintiff and notify him of the condition of the market and the precarious condition of his account. This contention is, however, without support in the evidence, which clearly shows that not even ordinary diligence was used in the effort to communicate with the plaintiff. It being undisputed that the plaintiff's telegraphic address might easily have been ascertained and that he was in regular communication by mail with his New York office, the ineffective calls of Schlesinger at the plaintiff's office are wholly insufficient to free the defendants from liability. At best these calls were only for the purpose of asking additional margin. There is no suggestion of even an intent to give notice of an intended sale, should such margin not be forthcoming. The suggestion that the plaintiff, in going to a remote locality for so long a time, should have left his address with the defendants, is entitled to no weight under the circumstances, especially in view of the fact that he had been advised before leaving by Schlesinger that his account was all right, and "that if anything happened he would take care of it."

It only remains, therefore, to consider the question of the measure of damages. On this the material facts are as follows:

On receiving notice of the sale of his securities, the plaintiff wrote to Schlesinger, under date of July 16th or 17th, a letter, not produced, but the contents of which, according to the best of the plaintiff's recollection, were as follows: "Notice of the sale of my securities just at hand. If my securities and account are not restored at once to their original status, I shall immediately institute criminal proceedings against you." No reply was made to this letter, and it appears that the fact of its receipt was not made known by Schlesinger to the defendants until July 31st or August 1st. When in town on July 31st, as before stated, the plaintiff wrote the defendants as follows:

"Rosenbaum & Stockbridge, Attorneys in Patent Cases.

"140 Nassau Street, New York, July 31, 1906.

"Messrs. Stiebel, Hernsheim & Co., 67 Exchange Place, N. Y. City—Gentlemen: On my return to town to-day I find that my account has not been restored to its original status, as requested. I therefore beg to say that I shall be compelled to proceed against you legally unless notice of its restoration is received at my office before noon to-morrow, the 1st prox. After the account has been restored, I direct that at 12 o'clock to-morrow, the 1st prox., you close out the 'special' account by selling 500 shares of N. Y. Central and 200 shares American Sugar Refinery at the market. I beg to say further that Mr. Schlesinger had absolutely no authority to either buy or sell stock for my account, and that the closing out of my line of stock was wholly unauthorized, and without either prior notice to me or call for additional margin. I am leaving town again to-night, but Mr. Stockbridge, my attorney, will have full authority to act in the matter.

"Yours very truly,    [Signed]  Wm. A. Rosenbaum."

On August 2d Schlesinger called on the plaintiff's partner, Stockbridge, on behalf of the defendants, and endeavored to make some adjustment with him of the matter in controversy. A correspondence followed, from which it may be inferred that delay was requested at the instance of the defendants, and with a view to adjust the plaintiff's claim without legal proceedings. On August 10th the plaintiff's partner, Stockbridge, wrote the defendants that unless he heard from them by return mail he should proceed to suit. This letter was followed by endeavors to arrange a conference, which finally took place on August 14th. Stiebel and Homan then called on Stockbridge and said that they would like to talk with the plaintiff. The latter did not return to New York until September 1st, having left Belgrade Lakes the previous day.

The rules of law applicable in actions of this sort are stated as follows in Burhorn v. Lockwood, 71 App. Div. 301, 75 N. Y. Supp. 828: "Cases of this nature have frequently been before the courts, and the rule is now well settled that where an unauthorized sale of stock of a fluctuating value is made by brokers, the customer may recover as damages the differences between the price at which the stock was wrongfully sold and the highest market price at which like stock was sold in the open market within a reasonable time thereafter. Wright v. Bank of Metropolis, 110 N. Y. 237 [18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356]; Griggs v. Day, 158 N. Y. 1 [52 N. E. 692]; Baker v. Drake, 53 N. Y. 211 [13 Am. Rep. 507]; s. c., 66 N. Y. 518 [23 Am. Rep. 80]; Scott v. Rogers, 31 N. Y. 676; Hoyt v. Fuller, 104 Fed. 192 [43 C. C. A. 466]. * * * The authorities hold that what is a reasonable time in such case on uncontroverted facts is a question of law for the court; but no case is cited, and we find none, which lays down any rule as to what constitutes a reasonable time, or states the elements that enter into the determination of the question, and therefore these precedents are of little or no aid. * * * In the absence of evidence of special circumstances showing other elements of necessity for further time, we think it may be stated as a general rule that the customer is entitled to a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day, or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase. Doubtless the customer's financial ability would not enter into a determina-

tion of the question; but, assuming that he had property or securities, he should be given a reasonable time to convert them into money or to raise money on their security. Perhaps the most important of these elements is time to reflect and consider what is the tendency of the market and at what price it is advisable to purchase, in view of all the facts and circumstances."

The defendants urge that the 17th of July, when the plaintiff wrote to Schlesinger, is the date that marks the limit of reasonable time in the present case, for the reason that the letter then sent clearly indicates that Rosenbaum had already determined that he wished to replace the stock. This suggestion is not persuasive, in view of the plaintiff's absence from the city of New York and the fact that it was only on or about the previous day that he had received notice of the sale of his stocks. His letter was evidently written in haste, under more or less excitement, and without opportunity for full consideration of the various questions involved. The plaintiff, on the other hand, contends that, because of the protracted conference and pleas for delay on the part of the defendants, his reasonable time for determining whether he wished to replace the stock was extended by the defendants' own acts to some period subsequent to August 14th, the date of the last interview between two of the defendants and plaintiff's partner. In my judgment, under all the circumstances, the reasonable time within which the plaintiff is entitled to the highest price at which the stock sold on the Exchange expired on the 31st day of July, when he spent the entire day in the city on his return from Washington. His letter of that date indicates that he had given sufficient attention to market conditions to decide as to what he wished to do with some of his securities, and no reason is apparent why he could not have reached a decision as to all of them. He naturally expected a reply of some sort to his letter to Schlesinger of July 16th or 17th. No reply being received, he was entitled to a reasonable period within which to determine upon his course of action. That period, as it seems to me, must be held to have expired when he found himself in New York on the 31st of July, with opportunity to obtain, either by personal interview or telephone, whatever explanation the defendants had to make of their conduct, to familiarize himself with market conditions, and to consider his legal rights. To extend the period beyond this date would be to permit the plaintiff to speculate on a rise of the market at the expense of defendants, which the courts do not sanction.

I accordingly conclude that the plaintiff is entitled to recover from the defendants the difference between the aggregate price at which his stocks were sold and the aggregate of the highest market prices of the same stocks during the period from July 12, 1906, to and including July 31, 1906. A draft report to this effect and appropriate findings may be submitted.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

A. Ely, for plaintiff.

F. L. Kolman, for respondents.

PER CURIAM.   Judgment affirmed on opinion of the referee.

---

(137 App. Div. 77.)

PEOPLE ex rel. FOOT v. GROSS, Village President, et al.

(Supreme Court, Appellate Division, Second Department.   March 31, 1910.)

1. MANDAMUS (§ 164*)—DEFENSES—SUFFICIENCY—ALLEGATIONS DENYING INFORMATION SUFFICIENT TO FORM BELIEF.

   In mandamus to compel removal of a fence from a street, denial by respondent of any knowledge or information sufficient to form a belief as to whether the fence was an encroachment upon the street is insufficient to put in issue the positive allegations to the contrary in the petition.

   [Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 350; Dec. Dig. § 164.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes