White, P.J.
 

 Defendant, Manufacturers National Bank of Grand Rapids, appeals as of right from a jury verdict and judgment in favor of the plaintiffs, Charles C. Stoddard and Grand Bank, as copersonal representatives of the estate of Howard P. Stoddard, deceased, with regard to their promissory estoppel claim in this case involving conversion of stock. We reverse and remand for a new trial on damages.
 

 i
 

 On October 29, 1989, Howard P. Stoddard died, leaving an estate valued at approximately $9 million, including 153,179 shares of Michigan National Corporation (mnc), the holding company for Michigan National Bank. The deceased’s will made his brother, Charles C. Stoddard, the founder and president of Grand Bank, and Grand Bank copersonal representatives of the estate. Because family members regarded the price of the mnc stock as depressed and strongly believed it would soon rebound in value, it was decided that the stock would not be sold and that loans would be obtained to pay federal and state estate taxes, using the stock as collateral. On August 27, 1990, plaintiffs borrowed $789,700 from defendant,
 
 *143
 
 secured by 53,179 shares of mnc stock, with the amount of the loan representing sixty percent of the value of the stock pledged. On that date, the stock was trading at about $24.75 a share. Plaintiffs also borrowed $1,700,000 from Comerica Bank, secured by 100,000 shares of mnc stock.
 

 From the date of the loan closing to October 10, 1990, the share price declined by thirty percent, from $24.75 to $16.75. There was evidence that on October 10, 1990, defendant requested a cash paydown from plaintiffs in light of the decline in the stock’s market value and that after discussion with plaintiffs, defendant orally agreed not to sell the stock unless its price declined to $16.50 a share. On October 11, 1990, defendant unilaterally sold 32,000 shares of the MNC stock held by it as collateral, at an average price of $17.09 a share.
 

 After defendant’s sale of the stock, the share price fell to a low of $13.25 on October 26, 1990. The share price then fluctuated between $13.75 and $20.50 until mid-February 1991, when it began a prolonged gradual increase that culminated in late October 1995, when the share price reached approximately $110V4 upon the stock’s being purchased by a foreign bank. Plaintiffs never repurchased the shares during this five-year period.
 

 On December 18, 1990, shortly after the bank sold the shares, plaintiffs filed their complaint. Plaintiffs’ first amended complaint alleged breach of contract, promissory estoppel, and negligence. After plaintiffs’ claims were dismissed on defendant’s motion for
 
 *144
 
 summary disposition,
 
 [1]
 
 plaintiffs appealed the dismissal of the breach of contract and promissory estoppel claims. This Court affirmed the dismissal of the breach of contract claim,
 
 [2]
 
 but reversed and remanded with regard to the promissory estoppel claim. The
 
 *145
 
 instant appeal concerns the postremand trial regarding the promissory estoppel claim.
 

 The jury found in plaintiffs’ favor with regard to the promissory estoppel claim and awarded damages of $2,171,930. Adding prejudgment interest, a judgment of $3,190,527.05 was entered.
 

 n
 

 Most of defendant’s challenges are in regard to the issue of damages. Defendant’s central argument is that the trial court erred in instructing the jury that in determining damages it could consider plaintiffs’ actual ability to repurchase the shares.
 
 [3]
 

 
 *146
 
 A
 

 The parties agree that in Michigan the measure of damages in stock conversion cases is the highest market value the stock attains between the date the owner receives notice of the conversion and the expiration of a reasonable period in which to repurchase the stock himself.
 
 Vos v Child, Hulswit & Co,
 
 171 Mich 595, 598; 137 NW 209 (1912) (citing
 
 McKinley v Williams,
 
 74 F 94; 20 CCA 312 [CA 8, 1896]);
 
 Butterfield v Metal Flow Corp,
 
 185 Mich App 630; 462 NW2d 815 (1990). This formula of measuring damages in stock conversion cases, known as the “New York rule,” was first adopted in Michigan in
 
 Vos
 

 [4]
 

 Vos,
 
 
 *147
 

 supra
 
 at 597-598. 4 Restatement Torts, 2d, § 927, comment e, pp 536-537 states:
 

 Exchange commodities—Highest replacement value.
 
 A special rule is applied in the case of the conversion of commodities of fluctuating value, of the kind customarily traded on public exchanges, such as stocks .... The purpose of the exceptional rule is to prevent defendants from appropriating and realizing the speculative possibilities of a rise in market value without any compensation to the plaintiff who is deprived of them.
 

 The courts have not been in entire agreement on the precise form of the special rule of damages to be applied. The position taken by the courts of New York and other leading commercial states is that the plaintiff is entitled to recover the highest market value reached by the commodity
 
 within a reasonable period during which it might have been replaced by purchase on the open market.
 
 This reasonable period does not begin to run until the plaintiff knows or has
 
 *148
 
 reason to know of the conversion; and it terminates when it becomes clear that the plaintiff,
 
 acting with reasonable promptness and with due allowance made for the necessity of inquiry obtaining legal advice and taking action as well as other relevant factors, would have been able to replace the commodity.
 
 The duration of the period is normally a question for the jury, subject to the control of the court as in the case of other questions of fact.
 
 [5]
 
 [Emphasis added.]
 

 The parties agree that the genesis of the New York rule adopted in
 
 Vos
 
 is twofold. First, the common-law rule regarding conversion damages did not sufficiently protect the party whose stock was converted because it permitted the party converting the property to take advantage of the speculative possibilities of a rise in the market without any compensation to the party deprived of the stock. However, the rule was refined to limit the relevant period for determining damages to a reasonable period, rather than extending the period through trial, to avoid the hardship imposed on defendants by subjecting them to the
 
 *149
 
 risks of a fluctuating market while awaiting trial.
 
 McKinley, supra
 
 at 103. See also anno:
 
 Comment Note—Measure of damages for conversion of corporate stock or certificate,
 
 31 ALR3d 1286, 1322-1323:
 

 A number of courts have felt that none of the measures of damages previously described does full justice to either the victim or the perpetrator of a stock conversion. Market value at the time of conversion seems fair to the victim if the market value is lower when he learns of it, but in a rising market it does not seem adequate. On the other hand, giving him the highest value to the time of trial could be unduly harsh to the converter, who might be helpless to avoid liability for a stock’s growth over a period of years, while the “victim” was getting a free ride on the market. . . . A compromise theory was developed . . . usually called the New York rule .... It provides for valuation at the highest market price of the stock between the time the customer has notice of the sale (usually called the conversion) and a reasonable time thereafter within which to decide whether or not to go into the market and replace the stock. The rule also gives him the option of claiming the market value at the time of conversion, to afford him the basic remedy in a falling market.
 

 In support of its argument that the trial court erroneously instructed the jury, defendant argues that application of the New York rule adopted in
 
 Vos
 
 is not dependent on a plaintiffs financial ability to replace the stock and that the only relevant consideration for the trier of fact is the amount of time the plaintiff reasonably needs to decide whether to replace the stock. Plaintiffs, on the other hand, argue that the “reasonable time” period closes when it becomes clear that a plaintiff would have been
 
 able
 
 to replace the commodity, and thus argue that the jury must determine the point at which the plaintiffs had the financial ability to repurchase the converted stock. Plaintiffs fur
 
 *150
 
 ther argue that the question what is a reasonable period is one of fact for the jury.
 

 In the instant case, it is unclear precisely how the jury arrived at the damages figure awarded. The figure was less than the amount requested by plaintiffs. The figure could have been based on a conclusion that a reasonable period expired about January 30, 1995, over four years after the sale, when the price reached $85 a share, or on a conclusion that a certain number of shares should have been repurchased shortly after the sale and that with regard to the remaining shares the period extended until November 1995, when the shares were purchased by the foreign bank for approximately $110 a share. In any event, plaintiffs do not assert that the jury was properly permitted to determine that the time plaintiffs took to arrange their finances to facilitate the repurchase of the stock was reasonable under all the circumstances. Rather, plaintiffs never repurchased the stock, and instead assert that the jury should have been permitted to conclude, as it apparently did, that at least with regard to the bulk of the stock, the reasonable period was without limit
 
 [6]
 
 because plaintiffs were unable to
 
 *152
 
 finance a repurchase. Stated differently, plaintiffs argue for a rule that would permit a plaintiff to enjoy the speculative potential of the market and place the defendant at risk from the date of notice of the conversion until trial if the plaintiff could establish that the plaintiff’s financial situation was such that the plaintiff did not have the ability to secure or provide funds for a repurchase acting with reasonable prudence.
 

 The issue whether financial ability to repurchase, where there has been no repurchase, is a relevant consideration extending what would otherwise be a reasonable period to permit repurchase under the New York rule is one of first impression in Michigan.
 
 [7]
 
 Other jurisdictions that have addressed the issue have concluded that the financial ability of the plaintiff to repurchase the shares is not to be considered in determining what constitutes a “reasonable time.” In
 
 Burhorn v Lockwood,
 
 71 AD 301, 304-305; 75 NYS 828 (1902), the court noted:
 

 In the absence of evidence of special circumstances showing other elements of necessity for further time, we think it may be stated as a general rule that the customer is
 
 *153
 
 entitled to a reasonable opportunity to consult counsel, to employ other brokers and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day or when the stock reaches a particular quotation, and to raise funds if he decide [s] to repurchase.
 
 Doubtless the customer’s financial ability would not enter into a determination of the question, but assuming that he had property or securities he should be given a reasonable time to convert them into money or to raise money on their security.
 
 Perhaps the most important of these elements is time to reflect and consider what is the tendency of the market and at what price it is advisable to purchase in view of all the facts and circumstances. [Emphasis added.]
 

 The
 
 Burhorn
 
 rule was approved and quoted verbatim in
 
 Rosenbaum v Stiebel,
 
 137 AD 912, 915; 122 NYS 131 (1910).
 
 Burhom
 
 was relied on by the Connecticut Supreme Court in
 
 Ling v Malcom,
 
 77 Conn 517; 59 A 698 (1905), a case in which the trial court instructed the jury that “the plaintiff’s financial condition was to be considered in determining when the first reasonable opportunity was afforded him to replace the stocks which had been sold.”
 
 Id.
 
 at 527. The Connecticut Supreme Court concluded that the instruction constituted error and ordered a new trial, noting,
 
 id.
 
 at 526-527:
 

 To enable a customer to recover damages from his broker for such an unauthorized sale of stocks, it is not necessary that the former should have actually repurchased them, or have ordered them repurchased.
 
 The question is, when, in the exercise of reasonable diligence and judgment, ought he to have ordered a repurchase
 
 if he desired to obtain the benefit of a possible future advance in price.
 
 But in determining when the customer had the first reasonable opportunity to replace the stocks sold, his financial inability to do so is not an element to be considered,
 
 although, when he has sufficient means, he is entitled to a
 
 *154
 
 reasonable time to convert his securities into cash in order to raise the sum required to replace the stocks.
 
 Burhom v Lockwood [supra]. The trial court therefore erred in instructing the jury that the plaintiff’s financial condition was to be considered in determining when the first reasonable opportunity was afforded him to replace the stocks which had been sold.
 
 [Emphasis added.]
 

 See also
 
 Bayer v Airlift Int'l, Inc,
 
 111 NJ Super 461, 474; 268 A2d 548 (1970), citing
 
 Ling, supra.
 

 Plaintiffs have cited no authority to the contrary. We conclude that the cases just discussed, although out of state and not recently decided, are more consistent with the New York rule adopted in
 
 Vos
 
 than the standard plaintiffs advance, which would permit the jury to extend the reasonable period well beyond that which is necessary to make and effectuate a considered judgment, where the plaintiff alleges financial inability to repurchase. We follow these cases and conclude that plaintiffs’ financial ability to repurchase the stock should not have been considered in determining what constituted a reasonable period within which to determine the highest intermediate share price.
 
 [8]
 

 
 *155
 
 B
 

 As stated above, it is unclear exactly how the jury arrived at its verdict. However, the jury must have extended the period for determining the highest intermediate price to at least four years from the sale. This period is, as a matter of law, beyond that which might be considered a reasonable time under the New York rule.
 
 [9]
 

 
 *157
 
 In the instant case, the record is clear that the parties executed the loan agreement on August 27, 1990, that defendant sold the 32,000 shares at issue on October 11, 1990, at an average price of $17.09 a share, that plaintiffs learned of the conversion on October 11, 1990, and that plaintiffs filed their complaint on December 18, 1990. The daily share price of MNC stock at pertinent times is also undisputed. From October 12, the day after the sale, to October 22, 1990, the stock closed at between $17.75 and $18.75. Beginning on October 23, 1990, the price declined, falling below $16.50 on October 24, and bottoming out on October 26, 1990, when it closed at $13.25. From October 23, 1990, through November 2, 1990, and from November 6 through 8, 1990, the closing share price was below $17. On November 9, 1990, the share price began to rise, with few and minor declines, and remained above $17 until December 27, 1990. During this period, the share price reached a high of $20.50 on November 28, 1990. From December 28, 1990, until January 23, 1991, the closing price remained below $17, reaching a low of $14.75 on January 16, 1991. On January 23, 1991, the closing price again reached $17, and then began a slow but steady increase, reaching $20.50 on February 12, 1991, breaking $30 for the first time on July 17, 1991, reaching $40 on August 21, 1991, but not again until December
 
 *158
 
 27, 1991, remaining basically in the $40s and low $50s throughout 1992, remaining in the $50s and $60s throughout 1993, the $60s and $70s throughout 1994, with the exception of two days, and jumping from the $80s to the $100s in February 1995, eventually reaching a value of $110% on October 26, 1995.
 

 Thus, it is uncontroverted that after the October 11, 1990, sale, the share price reached an intermediate high of $20.50 on November 28, 1990, and did not rise above that price until February 13, 1991, four months after the sale. Reasonable minds could not differ with regard to the question whether a reasonable period could extend beyond February 12, 1991, under the circumstances that opportunities to repurchase mnc stock at a share price below the $17.09 that defendant sold the shares at on October 11, 1990, were present on twenty-nine days between October 11, 1990, and January 23, 1991, including for several consecutive periods,
 
 [10]
 
 and that ample time elapsed between January 23, 1991, and February 12, 1991, to ascertain that the stock would likely remain above $17, at least for the near future. Because February 13, 1991, is beyond the time that might be considered reasonable and it is the first date that the stock reached an intermediate
 
 *159
 
 high above the level reached November 28, 1990, the period after November 28, 1990, is irrelevant. Stated differently, reasonable minds could not differ that the highest intermediate market value reached within a reasonable time after plaintiffs had notice of the conversion is, at most, $20.50 a share.
 

 c
 

 Defendant’s statement of questions on appeal raises several damages-related issues in addition to the issue whether financial ability is a permissible consideration. Having decided that the trial court erred in instructing the jury that it could consider financial ability, we need not address defendant’s assertion that plaintiffs failed to show that they lacked the financial ability to repurchase the stock. Likewise, in light of our conclusion that the November 28, 1990, price of $20.50 is the highest intermediate market value supported by the evidence, we need not address defendant’s assertion that the reasonable period must close, at the latest, on the date plaintiffs filed their complaint, December 18, 1990.
 

 Additionally, having determined that the maximum market value to be used in computing damages is $20.50 a share, we need not address defendant’s question whether the verdict was “excessive given that the price of the stock in fact dropped below $16.50/share only two weeks after [defendant’s] promise was allegedly made,” except to observe that while the verdict is, indeed, excessive, defendant’s argument, made in its brief, but not stated as an issue, that because defendant promised only that it would not sell the
 
 *160
 
 stock until it declined to a value of $16.50 or less a share,
 
 [11]
 
 the reasonable period can extend only from October 11, 1990, until October 24, 1990, when the stock fell to $16.50, is premised on the assumption that plaintiffs would not have made the bank secure by other means in the interval. Whether the reasonable period for assessing damages should have been limited to this thirteen-day period was a matter of argument properly left to the jury to determine.
 

 Next, we reject defendant’s mitigation argument as being contrary to the approach embodied in the New York rule. The principle of mitigation is subsumed in the allowance of a reasonable period to repurchase the stock. See
 
 Letson v Dean Witter Reynolds, Inc,
 
 532 F Supp 500, 503-505 (ND Cal, 1982), aff’d sub nom
 
 Shearson Loeb Rhoades, Inc v Bryant,
 
 730 F2d 769 (CA 9, 1984) (noting that “the effect of the duty to mitigate is simply to limit the time period during which the trader may reenter the market at the broker’s expense. Failure to reenter within a reasonable time period is deemed to be a decision to stay out.”). Within that reasonable period, plaintiffs are entitled to damages based on the highest intermediate market value. Defendant may not escape liability for damages on the basis that within that period, plaintiffs could have purchased at a price low enough to eliminate all loss.
 

 
 *161
 
 m
 

 Lastly, defendant argues that the trial court erred in refusing to instruct the jury with regard to repudiation. We disagree.
 

 At trial, defendant requested a special instruction regarding repudiation
 
 [12]
 
 and objected to the trial court’s failure to read the instruction, arguing that there were two instances from which a jury could determine that plaintiffs repudiated defendant’s promise. Defendant argued that repudiation occurred on
 
 *162
 
 October 11, 1990, when plaintiffs informed defendant that plaintiffs did not have cash with which to pay down a portion of the loan, and offered other collateral instead. Defendant also argued that repudiation occurred when Charles Stoddard told John Baum, a representative of the defendant, at a luncheon on October 11, 1990, that Baum should “do what you have to do,” and then Charles Stoddard traveled to South Carolina on business.
 

 There is no Standard Jury Instruction on repudiation, apart from one that pertains only to contracts under the Uniform Commercial Code (ucc).
 
 [13]
 
 When the Standard Jury Instructions do not adequately cover an area, the trial court is obligated to give additional instructions when requested if the supplemental instructions properly inform with regard to the applicable law and are supported by the evidence.
 
 Koester v Novi,
 
 213 Mich App 653, 664; 540 NW2d 765 (1995), aff’d in part and rev’d in part on other grounds 458 Mich 1; 580 NY2d 835 (1998). The determination whether the supplemental instructions are applicable and accurate is within the trial court’s discretion.
 
 Bordeaux v Celotex Corp,
 
 203 Mich App 158,
 
 *163
 
 168-169; 511 NW2d 899 (1993). Supplemental instructions when given must be modeled as nearly as practicable after the style of the Standard Jury Instructions and must be concise, understandable, conversational, unslanted, and nonargumentative. MCR 2.516(D)(4).
 

 This Court reviews jury instructions in their entirety.
 
 Wiegerink v Mitts & Merrill,
 
 182 Mich App 546, 548; 452 NW2d 872 (1990). The trial court does not commit error requiring reversal if, on balance, the parties’ theories and the applicable law were presented to the jury adequately and fairly.
 
 Murdock v Higgins,
 
 454 Mich 46; 559 NW2d 639 (1997).
 

 Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance.
 
 Paul v Bogle,
 
 193 Mich App 479, 493-494; 484 NW2d 728 (1992). In determining whether a repudiation occurred, it is the party’s intention manifested by acts and words that is controlling, not any secret intention that may be held.
 
 Id.
 

 The trial court addressed defendant’s objection to its failure to read the special instruction, noting:
 

 First, let’s talk about the fact that [M. Richard Olson, a senior vice president of Grand Bank] apparently took what was left in the line of the $500,000 line of credit and gave it to Comerica. First of all, the $500,000 which the estate had was a line of credit. It was never pledged to Manufacturers Bank. It was available to the estate to pay any and all debts that might arise. This was obviously known by Manufacturers Bank. There was never any representation that it would be held solely and only for the bank. Manufacturers, I
 
 *164
 
 believe, also knew that there was another larger loan than its outstanding to [sic] Comerica supported by stock.
 

 The fact that in that situation the estate—plaintiff estate spent some of its line of credit or the remainder of its line of credit to pay an obligation immediately due to another bank is not a repudiation of its agreements—underlying agreement with this bank nor a repudiation of the conditions of any promise being made to it.
 

 Secondly, let’s turn to the other factors. The three factors mentioned are Mr. Stoddard went to lunch and he went to South Carolina—we will call those the traveling objections.
 

 It has to be noted that the co-personal representative of this estate was Grand Bank and that before going to [the Rotary] lunch and to South Carolina, as I understood the testimony, Mr. Stoddard indicated, and I think this is even in the notes and records of the defendant bank, that he was leaving in charge of this situation Mr. Olson [sic].
 

 Mr. Olson was a senior vice president of Grand Bank which was a co-personal representative. He was in charge of calling Mr. Bud Stoddard which was what the estate promised to do to see about the situation relative to more collateral. The testimony is clear Mr. Olson knew Mr. Bud Stoddard very well.
 

 I find it impossible to believe that going to lunch or going to a business meeting, even if it is a business meeting in another state, is a repudiation of an entire agreement when you leave behind you a senior official of the bank handling the situation.
 

 As for what Mr. Stoddard said to Mr. Baum at lunch time, I find it difficult to describe that as a repudiation when Mr. Baum has himself in testifying said—or I believe Mr. Dean has said that what Mr. Baum reported to him about the conversation with Mr. Stoddard at lunch was not the basis for their selling this stock.
 

 Mr. Gruel {plaintiffs’
 
 counsel]: I believe Mr. Baum said that.
 

 The Court:
 
 Pardon?
 

 Mr. Gruel:
 
 Mr. Baum said that on page 25 and 6 of his deposition first.
 

 
 *165
 

 The Court:
 
 And I believe [Don Dean, chief executive officer and president of defendant] also said it. And if they didn’t think it was a repudiation, I don’t see how it can be argued that it is a repudiation.
 

 We agree with the trial court’s resolution of this issue. The evidence defendant relied on was insufficient to create a jury-submissible question regarding repudiation. The court therefore did not abuse its discretion in determining that it need not give the proposed special instruction.
 
 Williams v Coleman,
 
 194 Mich App 606, 623; 488 NW2d 464 (1992). We find no error.
 

 We reverse and remand for a new trial on damages within the parameters outlined in this opinion. We do not retain jurisdiction.
 

 [1]
 

 The trial court denied defendant’s initial motion for summary disposition pursuant to MCR 2.116(C)(10), and defendant’s delayed application for leave to appeal was denied by this Court. The trial court granted defendant’s subsequent motion for summary disposition.
 

 [2]
 

 This Court stated in pertinent part:
 

 Plaintiff first argues that the trial court erred in granting defendant’s motion for summary disposition because a genuine issue of fact existed regarding whether defendant acted in good faith in declaring plaintiff’s loan in default. Plaintiff argues that defendant did not act in good faith because: (1) plaintiff’s loan was fully collateralized, (2) defendant was going to receive a stock dividend in the amount of approximately $26,600 the next day, (3) the estate offered to pledge two pieces of real property valued at about $300,000 as additional collateral, and (4) the estate indicated that it would contact one of the decedent’s brothers to provide additional collateral in the form of additional shares of stock.
 

 Even accepting the above statements as true, we believe that defendant acted in good faith in declaring plaintiff to be in default. Sections 6(f) and (g) of the security agreement provide that default exists if there is a “material decline in value of the Collateral” or “the Bank feels insecure for any reason whatsoever.” Here, there was a material decline in the value of the collateral. The stock’s value went from $24.75 per share at the loan closing on August 27, 1990, to $17.00 per share on October 11, 1990. It is undisputed that this was about a thirty percent decrease in the value of the stock, and plaintiff’s expert conceded that a 30 percent decrease was a material decline in value. Furthermore, because of the material decline in the value of the stock, the bank was justified in feeling insecure. The decline in the value of the stock justified the bank in believing that the prospect of payment or performance was impaired. MCL 440.1208; MSA 19.1208. Because there was a material decline in the value of the stock which justified the bank in feeling insecure about the prospect of repayment, we agree with the trial court that no genuine issue of material fact existed regarding whether defendant’s actions were in good faith.
 
 [Stoddard v Manufacturers Nat’l Bank of Grand Rapids,
 
 unpublished opinion per curiam, issued December 27, 1994 (Docket No. 161744).]
 

 [3]
 

 Defendant challenges the following emphasized portion of the jury instruction regarding measuring damages, which stated:
 

 If you decide that the plaintiff is entitled to damages, it is your duty to determine the amount of money which will reasonably, fairly and adequately compensate it for its damages. To do so, you should go through the following steps:
 

 First, determine when the 32,000 shares of stock at issue in this case were sold and for what price. It is uncontroverted, that is, there is no question, that it was sold on October 11, 1990, for $17.09 per share for a total price of [$]546,880.
 

 Second, you should determine what would be a reasonable date under the circumstances of this case by which plaintiff after hearing of the sale could have repurchased the 32,000 shares of stock which defendant sold.
 
 Whether the estate could have repurchased is a fact question for you to decide from the evidence. You may consider the estate’s ability to secure or provide funds for such a purchase acting with reasonable prudence in doing so.
 

 Third, you must look to see what the highest price was that the stock reached between October 11, 1990, and the date you have determined to be a reasonable one for repurchase. You may determine that by looking at Exhibit 4 which lists the sale price of Michigan National Bank stock on all dates subsequent to October 11, 1990.
 

 Finally, the damage which plaintiff sustained under law would consist of the difference between the selling price on October 11, 1990, and the highest price that you have determined by referring to Exhibit 4, that is, the highest price between October 11, 1990, and the date which you determine would have been the reasonable
 
 *146
 
 date for repurchase. To that figure you may add as damages any dividends that would have been paid on the Michigan National Bank stock between October 11, 1990, and the date when you find that repurchase should have been made. [Emphasis added.]
 

 [4]
 

 The principal issue in
 
 Vos
 
 was whether the trial court properly computed the damages the plaintiff suffered as a result of the “defendant’s failure to deliver... 20 [sic, 2000?] shares of... stock” to him on the date he paid for them, March 12, 1909.
 
 Vos, supra
 
 at 596. The plaintiff had paid the defendant$1.44 a share for the stock. The value of the stock increased the next day and the defendant refused to deliver the shares to the plaintiff until the plaintiff paid the higher price. The plaintiff refused. When the purchase amount was returned to the plaintiff on March 31, 1909, the stock’s price had risen. The plaintiff sued for lost profits. The trial court directed a verdict in the plaintiff’s favor and awarded $20, on the ground that the plaintiff could have purchased the stock on the open market on March 13, 1909, at $1.45 a share or at a cost of an additional $20. The Supreme Court reversed, adopting and applying the New York rule:
 

 “[T]he general rule [for measuring damages] is that the measure of damages for . . . conversion, is the value of the property at the time it was . . . converted. This general rule, however, has been found inadequate to furnish just indemnity for the losses occasioned by the conversion of . . . stocks and other properties of like character, the values of which are subject to frequent and wide fluctuations. The general rule gives to the . . . broker . . . frequent opportunity to convert it to his own use, at a time when its market price is far below its actual value, and thus offers a prize for the breach of duty, while it often leaves the injured party remediless.
 

 
 *147
 
 To prevent this injustice, and to throw the chance of this loss upon him who inflicts, rather than upon him who suffers, the wrong, an exception has been ingrafted upon this general rule. It is founded upon the proposition that he who deprives another of the possession and control of such property ought to assume the risk of the fluctuations in its market value, until its owner, by purchase or sale, can restore himself to the condition in which he would have been if his property had not been wrongfully taken. ...”
 

 * ** *
 

 We are of the opinion that compensation will be more nearly attained by applying the exception to the rule, where damages are sought, as in this case, for a failure to deliver stock. It is quite obvious that the trial court applied the rule of damages usually applied for a failure to deliver personal property, or else he would not have fixed one day as a reasonable time in which plaintiff himself should have purchased the stock.
 

 If the facts surrounding the transaction were in dispute, or if different inferences could have been reasonably drawn from the agreed facts, the question of what was a reasonable time was one for the jury, otherwise it was a question for the court.
 
 [Vos, supra
 
 at 597-599 (quoting
 
 McKinley, supra).]
 

 [5]
 

 The Restatement,
 
 supra,
 
 sets forth two illustrations:
 

 4. A, a broker, embezzles stock certificates entrusted to him by B, at a time when a share of the stock has a market value of $90. B learns of this at once. Within a week, which is found to be a reasonable time for B to buy other shares available on the market, the stock has reached a value of $100. Subsequently, before suit is brought, it declines in value to $50. B is entitled to recover damages based on the value of $100 per share.
 

 5. A, a broker, entrusted with stock certificates by B, embezzles them at a time when a share has a market value of $90. A week later, the shares increase in value to $120. A month later, when B, who had no reason to discover the facts sooner, first learns of the embezzlement, the shares have a market value of $100. Within another week, which is the period found to be a reasonable time for B to replace the shares, they increase in value to $110. Later they decline in value to $50, which is their value at the time of trial. B is entitled to damages based on the value of $110 per share. [Restatement Torts, 2d, § 927, p 537.]
 

 [6]
 

 We note that in
 
 Weaver v Commercial Savings Bank,
 
 222 Mich 337, 340; 192 NW 578 (1923), a case involving conversion of stock decided after
 
 Vos,
 
 the Michigan Supreme Court reversed and remanded for a new trial on the basis of the trial court’s having instructed the jury that the measure of damages was the highest market value of the stock at any time during which it was wrongfully withheld from the plaintiff. The
 
 Weaver
 
 Court held that the instruction was contrary to
 
 Vos
 
 and also cited
 
 Wallace v H W Noble Co,
 
 203 Mich 58; 168 NW 984 (1918). In
 
 Wallace,
 
 the plaintiff brought suit for breach of contract after the defendant, on or about April 6, 1915, sold twenty shares of stock the parties held jointly, without notice to the plaintiff and in violation of the contract. The stock was originally purchased in October 1913 at $550 a share. The share value at the time the defendant sold the shares was between $675 and $700 a share. The plaintiff learned of the sale through a letter he received dated
 
 *151
 
 April 30, 1915. The defendant accounted to the plaintiff on the sale of the twenty shares at $685 a share, in addition to a dividend of $30 a share. The plaintiff filed suit about three months later, on July 31, 1915, and the jury awarded him $3,500, i.e., the equivalent of $175 a share. On appeal, the Supreme Court reversed on three grounds: (1) the trial court’s exclusion of evidence that the plaintiff told the defendant that shortly before commencing suit, he could have repurchased the stock and that the difference between the $685 a share accounted for to the plaintiff by the defendant and what it would have cost the plaintiff to have repurchased after learning of the stock sale was only $600; (2) the trial court’s refusal to allow the defendant to show what it would have cost the plaintiff to repurchase the stock within a reasonable time after learning of the wrongful sale; and (3) the jury instruction regarding damages, particularly with respect to “reasonable time.” The trial court had instructed the jury:
 

 “The measure of damages in stock transactions of this kind is the difference between the amount received and the highest intermediate value reached by the stock between the time the plaintiff had information of the wrongful acts complained of, and a reasonable time thereafter to be allowed to plaintiff to place himself in the position he could have been in, had not his rights been violated.
 

 “Now a reasonable time is such a period of time as would be a reasonable time in which to make a sale of stock held in joint account such as this; after one of the parties thereto makes a demand upon the other that the stock be sold, and in considering what would be a reasonable length of time, you must consider all the circumstances surrounding the case—not how quickly stocks could have been bought or sold, but what would be a reasonable length of time for him to wait before consenting to make sale of a joint account after demand had been made that he make a sale. A reasonable time would be the time which would elapse after notice to sell to the time when he could be legally required to make the sale.”
 
 [Id.
 
 at 62-63.]
 

 The Supreme Court reasoned,
 
 id.
 
 at 63-64:
 

 No case is cited by counsel on either side which is on all fours with the case we are now considering, but the principle involved was before this court in
 
 Vos [supra],
 
 in an opinion written by Mr. Justice Bird, who quotes with approval from the opinion of Mr. Justice Sanborn, in
 
 McKinley v Williams [supra],
 
 to the effect that though the general rule as to the measure of damages for failure to deliver ordinary personal property ... or for its conversion, is the value of the property at the time it is to be delivered, or at the time it is converted . . . , nevertheless this general rule is subject to an exception in the case of shares of stock which are subject to frequent and wide fluctuations in value, and that the plaintiff should be permitted to recover the highest market value which the stock
 
 *152
 
 attains between the time of its conversion and the expiration of a reasonable time to enable the owner to put himself
 
 in statu quo
 
 after notice to him of the conversion. The case is so recent and so accessible that we content ourselves with this reference to it.
 

 Counsel invoke ... the judicature act... to sustain the judgment in this case upon the theory that no injustice has been done the defendant. If it is true, as claimed by the defendant, that plaintiff, by the expenditure of six or eight hundred dollars, within a reasonable time could have placed himself
 
 in statu quo,
 
 we do not think that it can be said that a judgment in his favor of $3,500 is not an injustice.
 

 [7]
 

 Neither party has cited, nor have we found, any Michigan case directly addressing this issue.
 

 [8]
 

 Recognizing that this is a general rale and that individual circumstances might be presented involving special relationships, active fraud, or outright conversion of a party’s sole asset, which might cause the courts to recognize exceptions to the general rule, this is not such a case. Here the relationship was commercial; plaintiffs were indebted to defendant and the collateral securing that debt had substantially diminished in value; defendant applied the proceeds of the sale to plaintiffs’ legitimate debt; plaintiffs were obliged under the agreement upon which they sued to provide the defendant additional funds to avoid a sale; and, shortly after the sale, the price for each share dropped below the price at which the defendant said it would sell the shares, and below the price at which the defendant set the amount of the additional security requested. Defendant did not cause plaintiffs’ financial illiquidity. Plaintiffs’ financial illiquidity was at the heart of the transaction to begin with, and further financial illiquidity resulted from the stock’s falling value. Additionally, plaintiffs did
 
 *155
 
 not establish that they were diligently seeking to raise funds with which to repurchase the shares, and that this took a certain amount of time, a circumstance that seems to have been recognized as a legitimate factor for consideration in
 
 Burhorn, supra,
 
 and
 
 Ling, supra.
 
 Rather, plaintiffs asserted that they were obliged by circumstances to allocate their resources in other ways.
 

 [9]
 

 Of the approximately thirty state and federal cases cited in the ALR3d anno,
 
 supra,
 
 subsection 5(e), and
 
 id.
 
 1998 Supp, subsections 5(e), (f), the reasonable period decided in the vast majority was two months or less. Only two cases exceeded a year, both of which presented special circumstances not present in the instant case. In
 
 Hayward v Edwards,
 
 167 Misc 694; 4 NYS2d 699 (S Ct, 1938), a period of three years was held reasonable under the circumstances that the defendant stole a stock certificate from his ten-year-old nephew, forged the nephew’s signature, had the signature certified by one stockbroker, and sold it to another stockbroker. The theft was discovered five months later, an action was commenced a year after the discovery, and two years later the case was tried. The court concluded that both brokers had converted the stock and that a reasonable time extended from the date of notice of the conversion to the day of trial, i.e., three years. However, the
 
 Hayward
 
 court noted that the extended period was warranted only because of the special circumstances before it, i.e., the plaintiffs infancy and the fiduciary relationship between the defendant and the child:
 

 The cases which have had the court’s attention involving converted stock certificates had their inception in business transactions where, generally, mistakes had been made.
 
 (Burhorn v Lockwood [supra]
 
 [additional citations omitted].) Resting its judgment upon such considerations as mistake, honest error, and to thwart the plan of those who seek profit and not indemnity, the Court established the “reasonable time” rule of damages. Peckham, J., in
 
 Wright v Bank of the Metropolis
 
 (110 NY 237) [18 NE 79 (1888)], remarked, after reviewing numerous decisions: “In all this discussion as to the rule of damages, we have assumed that the defendant acted in good faith, in an honest mistake.” (p 249).
 

 
 *156
 
 The “reasonable time” has been greatly narrowed over the years. Fifteen days was held reasonable.
 
 (Minor v Beveridge,
 
 141 NY 399) [36 NE 404 (1894)]. Because within thirty days after the discovery the stock could have been bought on the open market for a price the same as or lower than it was selling for at the time of the discovery, only nominal damages were allowed.
 
 (Colt v Owens,
 
 90 NY 368) [1882],
 

 Defendant herein claims that the court should be guided in fixing that “reasonable time” by the cases cited and he suggests thirty days from discovery. These holdings fail of application here because factors dominate this situation which are the direct opposites of the inducements which prompted the court to set up originally the “reasonable time” rule.
 

 No one could read the cases without concluding that the “reasonable time” rule as established by them presumed that the plaintiff had a knowledge of stock trading. A theory is constructed in those decisions to the effect that plaintiff would have done that which would have brought him the greatest return on his investment, if his possession of the securities had not been interfered with. For instance, in fixing that “reasonable time” the courts have said that the victim was entitled to time after discovery in which to decide upon what course to follow in acjjusting his affairs. He might want to consult the market quotations; to advise with experts in trading; to raise the cash required for another purchase of stock or to repurchase the same securities that were converted.
 
 (Burhorn v Lockwood, supra.)
 
 That analogy will not be questioned were [sic] the one whose property was taken had the capacity to decide things of that nature. But a ten-year-old boy knows nothing of stock trading, consulting, repurchasing or fund raising.
 

 Applying the “reasonable time” rule, how long following discovery will be said to be reasonable in this situation? No authority on that question has been called to my attention. The inquiry ends just where it starts, because the boy has not yet discovered his loss, for the purpose of charging him with taking proper action to keep down the damages.
 

 The “reasonable time” for fixing damages in this child’s case began when the conversion was discovered, January, 1935. The boy has determined himself the date of expiration of the “reasonable time” by bringing the suit and moving it for trial. The period should not extend beyond the day of trial [January 26, 1938]. Whether we take the commencement of the suit or the day of trial makes no difference, because the logical day—-September, 1935 [sic]—when the stock was at its highest following discovery of the conversion preceded both of those dates.
 
 [Hayward, supra
 
 at 695-697.]
 

 
 *157
 
 In
 
 Wilson v Colorado Mining Co,
 
 227 F 721; 142 CCA 245 (CA 8, 1915), the court, applying the rule that damages are available from the date of conversion, and not the New York rule, concluded that the period between July 1900 and January 1, 1909, was reasonable where, in July 1900, the defendant issuing company converted the plaintiffs shares by secretly levying an assessment on them and then transferring the shares to itself when the assessment went unpaid. However,
 
 Wilson
 
 presents special circumstances not present in the instant case in that the plaintiff learned of the conversion seven years after the conversion.
 

 [10]
 

 Between the date of conversion, October 11, 1990, and January 23, 1991, mnc stock closed at $16.50 or less a share on twenty-five days, including once for eight consecutive days (October 24 through November 2, 1990), once for two consecutive days (November 6 and 7), and once for fourteen consecutive days (January 3 through January 22, 1991). Between October 11, 1990, and January 23, 1991, mnc stock closed at less than $17 on twenty-nine days, including nine consecutive days (October 23 through November 2, 1990), three consecutive days (November 6 through November 8, 1990), and seventeen consecutive days (December 28, 1990, through January 22, 1991). From October 11, 1990, to January 23, 1991, the closing price hit a low of $13.25 on October 26, 1990, and a next-closest low of $14.75 on January 16, 1991.
 

 [11]
 

 Thus, defendant argues that the maximum amount of damages should be $53,120, because the highest intermediate market value between October 11 and October 24, 1990, was $18.75 a share. ($18.75 minus $17.09 = $1.66 and $1.66 multiplied by 32,000 = $53,120.]
 

 [12]
 

 The amended instruction contained in the lower court record reads:
 

 SPECIAL INSTRUCTION NO. 6
 

 (PROMISSORY ESTOPPEL—INJUSTICE)
 

 Finally, even if you find that Manufacturers made a clear and definite promise upon which the Estate relied and Manufacturers should have reasonably expected that reliance, you must still decide whether enforcement of the promise is necessary to avoid injustice. In making this determination, you may consider whether the Estate’s reliance on Manufacturers’ statements was reasonable or not based upon the Estate’s own statements and actions on October 11.
 

 Because the theory of promissory estoppel involves the enforcement of a promise, you may also consider other rules involving the enforcement of contracts. In other words, it would not be just to enforce an oral promise under the theory of promissory estoppel if another rule says that the promise is unenforceable even if it were made. One of these other rules is what is called “repudiation.” Put simply, a person who promises to do something is no longer bound by his promise if the other person says something or does something which indicates that the other party is not going to live up to his end of the bargain. Let me give you an example. Suppose Allen hires Bill on the condition that Bill reports to work within 10 days. Bill however leaves on a 6-month world cruise. Allen is no longer bound by his promise to Bill because Bill’s vacation indicates that Bill cannot perform his end of the bargain, that being to report for work within 10 days.
 

 Unless you believe that the enforcement of Manufacturers’ promise is necessary to avoid an injustice, the Estate will not have established its promissory estoppel claim and your verdict must be in favor of Manufacturers.
 

 [13]
 

 All the Standard Jury Instructions on contract actions are for ucc cases. SJI2d 140.15, entitled Contract Action—ucc: Anticipatory Repudiation—Definition, states:
 

 The
 
 [buyer/seller]
 
 claims that the
 
 [seller/buyer]
 
 breached the contract by repudiating
 
 [his/her/its]
 
 obligations under the contract before performance was due.
 

 Repudiation occurs when a
 
 [seller/buyer]
 
 distinctly tells, or through
 
 [his/her/its]
 
 actions clearly shows, the
 
 [buyer/seller]
 
 that
 
 [he/she/it]
 
 does not intend or is unable to perform the contract or any part of the contract, and the loss of performance substantially impairs the value of the contract to the [buyer/seller].
 

 You must determine whether the
 
 [seller/buyer]
 
 breached the contract by repudiation.